460 A.2d 1139

**COMMONWEALTH of Pennsylvania**

v.

**Joseph George ROMERI, Appellant.**

Superior Court of Pennsylvania.

Argued Dec. 15, 1981.

Filed May 6, 1983.

Petition for Allowance of Appeal Granted Aug. 8, 1983.

282

Thomas J. Calnan, Jr., Allentown, for appellant.

William H. Platt, District Attorney, Allentown, for Commonwealth, appellee.

Before McEWEN, JOHNSON and WATKINS, JJ.

McEWEN, Judge:

We here review an appeal from the judgment of sentence imposed after appellant was convicted by a jury of murder in the second degree, burglary, theft by unlawful taking, receiving stolen property and criminal conspiracy. Appellant was sentenced to serve a term of life imprisonment upon the murder conviction and a consecutive term of from two to seven years upon the other convictions.

Stella A. Bremmer was eighty years of age when she was bludgeoned to death on November 9, 1978. Four days later, appellant voluntarily accompanied two officers to the Allentown Police Station for questioning. Since appellant was not yet 17 years of age, the police provided for the presence of his mother, who with appellant was apprised of the *Miranda* warnings. Appellant thereafter gave and subsequently wrote and signed a statement admitting his complicity in the killing of Stella A. Bremmer during the commission of the burglary of her home. The juvenile probation officer of appellant, as well as another juvenile officer, were present with appellant and his mother when appellant made his statement, and the mother herself signed as a witness to the execution of the statement by her son.[1]

The record reflects that appellant and co-defendant, Michael Reinhard, after consuming a quantity of marijuana,

1. The handwritten statement of appellant given to the Allentown police reads as follows:

Thursday the 9th [November] 1978, before I went to Mike's house, I got drunk. I then went to Mike's house and we went out for a ride. When we came home we were bored so we went over to the church to investigate. We found an open window then went inside. We had no intentions of taking anything. We walked around and the floor creaked. When we were just about to leave Mike had found a bottle of whiskey or something so we took that. We went for a ride then back. Mike drove because I couldn't. When we got back we decided to investigate Stella's so we went on the parking deck to see if she was home. We guessed she was either away or sleeping. When we tried to get into the back window, it made a loud noise so we left. We figured that she would hear the noise and call the police. When we got back from another ride we saw all the lights out and no police around so we tried again. This time the window opened so we went in to investigate. We stayed on the 1st floor and found about $10.00. Then we went upstairs quietly. I didn't see anybody then when I closed my eyes I opened them again and I saw blurredness then I saw Stella. I snapped out. Mike then held her down and I hit her with something but I don't remember how many times and what it was. After I hit her we split because she was making funny noises. After I got something to eat we went back. We figured she was dead but she wasn't. I got in my mind to call an ambulance then leave but I was so blitzed I couldn't. After we got some purses we left and I got rid of the gloves purses and object. When I speak of Mike I mean Mike Reinhard 414 Oak Street. When I speak of Stella I speak of Stella Bremer 418 Oak Street. Purses [were] taken [the] 2nd time in Stella's house.

gained entry to the house of Mrs. Bremmer through an open rear window. Appellant and the co-defendant then searched the house and took a small amount of money. The co-defendant testified that while he was in the kitchen he heard "muffled sounds" from upstairs, as a result of which he ascended the stairs, and saw appellant standing with a pipe over the bloodied body of Stella Bremmer.

Appellant testified that in addition to smoking marijuana, he ingested LSD, two or three bottles of ale and a swallow of whiskey or wine. He further testified that he was not certain whether or not he hit the victim, but since his accomplice told him he struck Stella Bremmer, he therefore believed that he inflicted the blows. Appellant also indicated uncertainty as to whether the statement he made to Detective Monahan was part of his honest recollection.

The record reflects that appellant, while incarcerated, wrote a letter to his mother in which he stated, *inter alia:*

... Mom, I talked to my lawyer last night. Mom, I am facing life in jail. I need your help. Do as my lawyer tells you to, please. He says I have a chance of being found not guilty. That means I can get away with murder....

Prior to the trial, the court denied the following applications of appellant: (1) a petition to transfer the case to juvenile court; (2) a motion to suppress the statement to Detective Monahan; and (3) a motion for bail.

On the morning of trial, April 2, 1979, a local daily newspaper reported upon the court opinion and order that denied the petition of appellant to transfer the case to the juvenile court. That same article also reported upon the opinion and order of the court that denied the petition of co-defendant Michael Reinhard for transfer to juvenile court.

Appellant, prior to the empaneling of a jury, moved for a change of venue as a result of the newspaper article, but the court held the motion under advisement. That evening, another local newspaper reported the "plea for venue

change". Upon completion of voir dire, the trial judge denied the motion of appellant for change of venue.

█ Appellant asserts that the trial court erred when it refused to dismiss for cause four prospective jurors who had read or discussed the newspaper article of April 2, 1979, and had been thereby challenged for cause. Our eminent President Judge William F. Cercone, in *Commonwealth v. Lucchese*, 233 Pa.Super. 273, 279, 335 A.2d 508, 511 (1975), delineated the principle pertinent to this issue:

> [T]he fact that a juror has read a newspaper account concerning the accused and the crime at bar does not require that the juror be excluded for cause. It must be shown that the juror has formulated a fixed opinion precluding him from reaching a verdict based solely on the evidence produced at trial....

The Pennsylvania Supreme Court reiterated this principle when the eminent Justice Robert N.C. Nix, Jr., in *Commonwealth v. Hoss*, 469 Pa. 195, 200–01, 364 A.2d 1335, 1338 (1976), declared:

> The mandate for a fair and impartial jury does not require that the prospective jurors be free of all knowledge of the facts and circumstances surrounding the incident which forms the basis of the trial.

> \* \* \* \* \* \*

Thus, the critical question where members of the panel have been exposed to pre-trial media publicity, is whether or not they are capable of casting aside any impressions or opinions they may have formed and render a verdict based solely upon the evidence presented to them during the course of the trial.

The en banc opinion of the Common Pleas Court provided the following description of the effort to secure an impartial jury:

> [T]he Court, in recognizing the weight that a judicial opinion would receive in the community, took care to insure the selection of an impartial jury for trial. Wide latitude on voir dire examination was extended by the

Court in recognition of the problem; every defense challenge for cause was granted where a prospective juror had read a recent newspaper article involving the case—whether or not that prospective juror had any recollection of the newspaper account or had formed an opinion. Of the fourteen (14) jurors seated, not one had read the allegedly prejudicial publicity.

■ Our review of the record does not indicate that any juror had an opinion that was fixed so as to preclude a deliberation and decision solely upon the evidence. As a result we conclude there is no merit to this contention of appellant.

■ Appellant next asserts that he was arrested without probable cause at his place of employment. He argues, therefore, that any statements subsequently made were the fruit of an illegal arrest and, for that reason, should have been suppressed. "In reviewing the findings of the suppression court, this court must determine whether the record 'supports the suppression court's factual findings and the legitimacy of the inferences and conclusions drawn from those findings. In making this determination, we consider only the evidence of the prosecution's witnesses and so much of the evidence for the defense as, fairly read in the context of the record as a whole, remains uncontradicted.'" *Commonwealth v. Crissy*, 304 Pa.Super. 38, 450 A.2d 89 (1982) (quoting *Commonwealth v. Kichline*, 468 Pa. 265, 361 A.2d 282 (1976) and *Commonwealth v. Hunt*, 280 Pa.Super. 205, 421 A.2d 684 (1980)).

The suppression hearing record reflects that investigating officer Gerald Monahan, who was dressed in civilian clothing and accompanied by a juvenile officer, located appellant at his place of employment, identified himself and said: "I would like to talk to you. Would you mind coming down to the police headquarters with me?" Detective Monahan testified that he informed appellant that he was not under arrest stating: "You aren't getting blamed for a thing. I just want to talk to you." The detective further testified that he asked appellant "if his mother would come with

them", indicated that the conference would take about an hour, and offered to return appellant to his place of employment at the termination of the interview. The record clearly establishes that appellant was aware that he was not told that he was under arrest, and that after locating Mrs. Romeri, appellant, of his own volition, accompanied the officers to the police headquarters. The record further reflects that before being questioned, appellant was apprised of the *Miranda* rights and of the right to a private conference with his mother and his probation officer, who was, at his request, made available to him for counseling. It was not until after appellant made his confession that he was told he was under arrest.

The determination of when an arrest occurs depends on an evaluation of all the surrounding circumstances. *Commonwealth v. Crissy, supra,* 304 Pa.Superior at 42, 450 A.2d at 91. An arrest may be constructive or actual, *id.*, and is accomplished by "any act that indicates an intention to take a person into custody and subjects him to the actual control and will of the person making the arrest." *Commonwealth v. Bosurgi,* 411 Pa. 56, 68, 190 A.2d 304, 311 (1963), *cert. denied, Bosurgi v. Pennsylvania,* 375 U.S. 910, 84 S.Ct. 204, 11 L.Ed.2d 149 (1963) (quoting 5 Am. Jur.2d, Arrest § 1, p. 695). *See also Commonwealth v. Holmes,* 482 Pa. 97, 393 A.2d 397 (1978); *Commonwealth v. Richards,* 458 Pa. 455, 327 A.2d 63 (1974). "An arrest may thus be effectuated without the actual use of force and without a formal statement of arrest." *Commonwealth v. Benson,* 280 Pa.Super. 20, 27, 421 A.2d 383, 386 (1980). *See also Commonwealth v. Holmes, supra; Commonwealth v. Crissy, supra; Commonwealth v. Haggerty,* 282 Pa.Super. 369, 422 A.2d 1336 (1980), *rev'd on other grounds,* 495 Pa. 612, 435 A.2d 174 (1981); *Commonwealth v. Allessie,* 267 Pa.Super. 334, 406 A.2d 1068 (1979). However, the question of when an arrest occurs is determined by an objective standard, namely, the reasonable impression conveyed to the person subjected to seizure or detention rather than the subjective view of such person or of the arresting officer.

*Commonwealth v. Holmes, supra; Commonwealth v. Richards, supra; Commonwealth v. Trenge,* 305 Pa.Super. 386, 451 A.2d 701 (1982); *Commonwealth v. Crissy, supra; Commonwealth v. Haggerty, supra; Commonwealth v. Benson, supra.*

■ Our review of the suppression record leads us to conclude that appellant was not arrested at his place of employment. Appellant testified that he willingly decided to proceed to the police station and that no force was employed by detective Monahan to compel this decision. There is no evidentiary basis for a conclusion that detective Monahan arrested appellant at his job or that appellant had been subjected to his control and will. Accordingly, we reject the contention of appellant that the statements subsequently made were suppressible as the product of an unlawful arrest.

■ Appellant further contends that the trial court improperly denied the motion to suppress the confession of appellant for the reason that the confession was obtained through trickery, subterfuge and deceit. The hearing judge held the confession admissible on the basis of the decision of this court in *Commonwealth v. Thomas,* 258 Pa.Super. 332, 392 A.2d 820 (1978). The Pennsylvania Supreme Court, however, reversed that decision and stated, as it concluded that a counsellor of adult prisoners was not an "interested adult":

> The Commonwealth has the burden of establishing that, prior to waiving Fifth Amendment rights, a juvenile had the opportunity to consult with an 'interested adult.' The individual must be both interested in the juvenile's welfare and informed and aware of the juvenile's fifth and sixth amendment rights. *See e.g., Commonwealth v. Barnes,* 482 Pa. 555, 394 A.2d 461 (1978). This Court's 'interested adult' cases rest upon a concern that juvenile immaturity may preclude self-protection from overbearing police interrogation. The rule intends that overbearance may be avoided by consultation with individuals such as a 'lawyer, adult relative or friend,' who can provide a

juvenile with the 'protection which his own immaturity could not.' *Gallegos v. Colorado*, 370 U.S. 49, 54, 82 S.Ct. 1209, 1213, 8 L.Ed.2d 325 (1962). *Accord, Haley v. Ohio*, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1948). *Commonwealth v. Thomas*, 486 Pa. 568, 571, 406 A.2d 1037, 1038 (1979). (footnotes omitted). *See also Commonwealth v. Williams*, 309 Pa.Super. 63, 454 A.2d 1083 (1982) (1982). The Supreme Court thereby accepted the view expressed in the *Thomas* dissent by our distinguished colleague Judge Edmund B. Spaeth, Jr., joined by our eminent President Judge William F. Cercone, that:

> Any other interpretation of the Supreme Court's requirement of an 'interested adult' would make no sense, for it would read the Court as saying that its requirement could be satisfied in either of two mutually inconsistent ways: either by affording the juvenile access to one of two parties initially interested in his welfare—an attorney or parent—or by affording him access to a person only casually interested.

*Commonwealth v. Thomas, supra* 486 Pa. at 572, 406 A.2d at 1038 (quoting the dissent of Judge Spaeth in *Commonwealth v. Thomas*, 258 Pa.Super. 332, 441–42, 392 A.2d 820, 825 (1978)).

Nonetheless, we will not disturb the finding of the hearing judge that the mother of appellant and juvenile probation officer Zydel were "interested adults" since the hearing judge actually based his conclusions upon the notions that the Supreme Court declared to be decisive in such situations:

> [W]e note the dissent of Judge Spaeth in *Thomas*. However, we are satisfied that the reasons for his dissent in *Thomas* are not present in the case. In *Thomas*, Judge Spaeth disagreed with the majority's conclusion .that a prison counsellor was an 'interested adult' for the purpose of an effective juvenile *Miranda* waiver. In the case at bar the defendant's mother, unquestionably an 'interested adult' was present and there is no question that the *Miranda* rights were fully explained to her and

the defendant. Judge Spaeth also concluded that the police made no reasonable effort to afford the appellant access to an 'interested adult.' Again the facts in our case are contrary to that conclusion, because the police, at the defendant's request, brought in Probation Officer Zydel, who the defendant regarded as an interested adult, and Ms. Zydel once again informed the defendant and his mother of the *Miranda* rights. Finally, Judge Spaeth in his *Thomas* dissent concluded the police impermissibly interfered with such access to an 'interested adult' as was provided by remaining in the room while the juvenile conferred with an adult. However, in the present case it is undisputed that the juvenile, his mother and the Probation Officer had the fullest privacy.

 Appellant next argues that the trial court erred in denying his petition to transfer the murder charge from adult to juvenile court. If appellant is to prevail, he must show a gross abuse of the broad discretion of the hearing judge who refused the transfer application. Such abuse may not merely be an error of judgment, but must be a misapplication of the law or an exercise of manifestly unreasonable judgment based upon partiality, prejudice or ill will. *Commonwealth v. Bey*, 249 Pa.Super. 185, 375 A.2d 1304 (1977).

 The pertinent portion of the Juvenile Act provides:

Section 6322. Transfer from criminal proceedings

(a) General rule.—..., if it appears to the court in a criminal proceeding other than murder, that the defendant is a child, this chapter shall forthwith halt further criminal proceedings, and, where appropriate, transfer the case to the division or a judge of the court assigned to conduct juvenile hearings, ... If it appears to the court in a criminal proceeding charging murder, that the defendant is a child, the case may similarly be transferred and the provisions of this chapter applied....

42 Pa.C.S.A. § 6322. It is thus clear under the Juvenile Act that a criminal proceeding charging murder by a juvenile

*may* be transferred to the division of the court assigned to conduct juvenile hearings. The careful process that must be employed in connection with such a transfer was articulated by the Pennsylvania Supreme Court when in *Commonwealth v. Pyle,* 462 Pa. 613, 342 A.2d 101 (1979), it held:

> Murder has always been excluded from the jurisdiction of the juvenile courts.... Having continued to place murder, even when a young offender is involved, within the original and exclusive jurisdiction of the adult court, the assumption that the need for adult discipline and legal restraint exists in cases of this heinous nature also continues. With this in mind it becomes the juvenile's burden to show that he does not belong in the criminal court. In other words, it is the youth who must prove that he belongs in the juvenile setting by showing his *need* and *amenability* to the 'program of, supervision, care and rehabilitation' which he would receive as a juvenile. In the event the evidence does not affirmatively demonstrate that he is the kind of youth who would benefit from the special features and programs of the juvenile court system and in the event no special reason exists for sparing the youth from adult prosecution and punishment (as for instance, evidence of mental illness or retardation) jurisdiction would necessarily remain within the criminal court system.

*Id.,* 462 Pa. at 622–23, 342 A.2d at 106–07. (footnotes and citations omitted) (emphasis in original). The Court observed that "the determinative factors in deciding whether the youth is amenable to juvenile treatment will differ from case to case" and outlined an approach for determining whether to grant a transfer:

> Such determination should be made after careful review of the individual child's *personal* make-up, (e.g., mental capacity and maturity as determined by consideration of his home and school environment situation, emotional attitude, and pattern of living) his previous history (including any previous contact with law enforcement agencies and/or juvenile courts) and the nature and circum-

stances of the alleged homicide (e.g., inquiry into whether the killing was committed in an aggressive, violent or wilful manner, whether the safety of the community requires lengthy incarceration, whether it is more desirable to dispose of the entire offense in one court should the juvenile's associates in the alleged homicide be adults not within the juvenile jurisdiction).

*Id.*, 462 Pa. at 623 n. 13, 342 A.2d at 106–07 n. 13. (citations omitted) (emphasis in original) *See also Commonwealth v. Sourbeer*, 492 Pa. 17, 422 A.2d 116 (1980). In any event, the law is clear that any transfer determination under the Juvenile Act is within the sound discretion of the Common Pleas Court. *Commonwealth v. Pyle, supra* 462 Pa. at 618, 342 A.2d at 104 (1975); *Commonwealth v. Barber*, 275 Pa.Super. 144, 151, 418 A.2d 653, 660 (1980).

Appellant alleges in his brief that the hearing court relied almost entirely on the "enormity of the crime" to deny the petition to transfer and that the trial court, therefore, abused its discretion by applying an improper standard, thereby ignoring the historic purpose of the juvenile court system. Our review convinces us that both the certification hearing court and the court en banc adequately reviewed and properly disposed of this claim. The record reflects that while the hearing court took into consideration the youth of appellant, the testimony of the psychologist and the psychiatrist concerning appellant was not favorable. Certainly the "enormity of the crime", the manner of its commission which the court described as "particularly vicious", and the character of appellant as reflected by his letter to his mother seeking her assistance to enable him to "get away with murder" were factors of considerable influence upon the decision of the court to proceed with trial in the criminal court. Our careful study of the entire record and the briefs leads us to share the conclusion of the hearing judge that appellant failed in his burden and did not establish the amenability of a trial in the juvenile court system. As the hearing judge opined in holding the case inappropriate for transfer to Juvenile Court:

294.

We have weighed and considered the evidence presented to Joseph Romeri's personal makeup, character, maturity, family and home situation, his previous contact with law enforcement agencies, his direct role in the killing of Mrs. Bremmer as well as his almost complete, callous disregard to the enormity and horror of his actions. We simply do not believe that Romeri's need for care, guidance and control as a juvenile is outweighed by the state and society's need to apply legal restraint and discipline as an adult. Accordingly, we conclude that the evidence does not affirmatively demonstrate that Romeri is amenable to treatment as a juvenile.

■■■ Appellant further contends that the court erred in allowing the initiation and prosecution of the non-homicide charges in adult court. He voices the argument that when a juvenile is charged with homicide it should not cause the automatic certification of non-homicide charges to criminal court and urges that the proper procedure for charging a juvenile with homicide and other related charges which arise out of the same incident is to: (1) initiate the non-homicide charges in juvenile court; and (2) thereafter certify such charges to criminal court. We conclude that the Lehigh County en banc opinion properly decided the issue when it determined that the criminal adult court had jurisdiction over the lesser related charges as well as the murder charge. It is clear that such charges constituted an integral part of the murder offense. Since the juvenile court, in the first instance, had no jurisdiction over the murder charge and since the lesser related charges were integrally related to that charge, the hearing court did not err when it denied the motion of appellant to transfer the lesser related offenses to juvenile court. *See Commonwealth v. Keefer*, 470 Pa. 142, 367 A.2d 1082 (1976), *cert. denied, Keefer v. Pennsylvania*, 434 U.S. 1009, 98 S.Ct. 717, 54 L.Ed.2d 751 (1978), *reh. denied*, 435 U.S. 938, 98 S.Ct. 1514, 55 L.Ed.2d 534 (1978).

■■■ Appellant next argues that the trial court improperly denied a motion to limit evidence under Pennsylvania

Rule of Criminal Procedure Rule 305 E by allowing into evidence the letter written by appellant to his mother. The letter had been a subject at pre-trial proceedings and, therefore, there is no basis for any claim that the Commonwealth failed to disclose the existence of the letter. Appellant cites Pennsylvania Rule of Criminal Procedure 305 B that requires the Commonwealth to permit counsel for the defendant to inspect and copy such evidence. As we have already noted, the letter was the subject of pre-trial proceedings which would, of course, have afforded counsel the opportunity to inspect the letter and counsel for appellant does not contend the Commonwealth refused his request to further inspect or copy that exhibit. We conclude, therefore, that the trial court properly ruled upon this issue. *Cf. Commonwealth v. Gibson,* 271 Pa.Super. 499, 414 A.2d 364 (1979) (where defense counsel was aware at suppression hearing that only eyewitnesses to crime initially failed to identify defendant, no merit to contention that Commonwealth withheld evidence).

■■■ Appellant proceeds to contend that it was error to permit voir dire on the death penalty, since the result of such an empaneling was a "death-qualified" jury. Appellant contends, therefore, that this jury selection procedure excluded "persons who indicated they would be most conscientious in applying the reasonable doubt standard" and included persons "more apt to convict—or convict of a higher degree." [2] In addressing this issue, the Pennsylvania Supreme Court in *Commonwealth v. Martin,* 465 Pa. 134, 348 A.2d 391 (1975), *cert. denied,* 428 U.S. 923, 96 S.Ct. 3234, 49 L.Ed.2d 1226 (1976), stated:

**2.** We note that appellant was convicted of second degree murder and that, therefore, the death penalty does not here apply. 42 Pa.C.S.A. § 9711. While this issue would, therefore, appear to be moot (*See Bumper v. North Carolina,* 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); *Commonwealth v. Martin,* 465 Pa. 134, 348 A.2d 391 (1975), *cert. denied, Pennsylvania v. Martin,* 428 U.S. 923, 96 S.Ct. 3234, 49 L.Ed.2d 1226 (1976); *Commonwealth v. Dukes,* 460 Pa. 180, 331 A.2d 478 (1975); *Commonwealth v. Roach, supra* ), we shall, nevertheless, address it since it concerns a significant aspect of the procedure for jury selection in a case charging murder.

In *Witherspoon* [*v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), *reh. denied, Witherspoon v. Illinois*, 393 U.S. 898, 89 S.Ct. 67, 21 L.Ed.2d 186 (1968) ], the Supreme Court of the United States refused to accede to this argument because the data there before it were 'too tentative and fragmentary', 391 U.S. at 517–18, 88 S.Ct. at 1776–1775, 20 L.Ed.2d at 782. This Court likewise rejected the same contention in *Commonwealth v. Speller*, 445 Pa. 32, 282 A.2d 26 (1971) because it was 'without persuasive foundation and is mere speculation.' 445 Pa. at 35, 282 A.2d at 28. *See also Commonwealth v. Hudson*, 455 Pa. 117, 314 A.2d 231 (1974); *Commonwealth v. Kenney*, 449 Pa. 562, 297 A.2d 794 (1972); *Commonwealth v. Roach*, 444 Pa. 368, 282 A.2d 382 (1971).

*Commonwealth v. Martin, supra* 465 Pa. at 162, 348 A.2d at 405. *See also Commonwealth v. Story*, 497 Pa. 273, 440 A.2d 488 (1981) (Larsen, J., dissenting); *Commonwealth v. Ashburn*, 459 Pa. 625, 331 A.2d 167 (1975). *Accord Smith v. Balkcom*, 660 F.2d 573 (5th Cir.1981), *mod.* and *reh. denied*, 671 F.2d 858 (5th Cir.1982), *recalled*, 677 F.2d 20 (5th Cir.1982), *cert. denied*, 459 U.S. 882, 103 S.Ct. 181, 74 L.Ed.2d 148 (1982). It is clear, however, that a conviction by a death-qualified jury will be reversed if the defendant so convicted can prove that *such* jury was prone to favor the prosecution in the determination of guilt. *Witherspoon v. Illinois, supra* 391 U.S. at 517–18, 88 S.Ct. at 1774–75, 20 L.Ed.2d at 782–83. *See also Commonwealth ex rel. Fitzpatrick v. Bullock*, 471 Pa. 292, 302 n. 8, 370 A.2d 309, 313–14 n. 8 (1977); *Commonwealth v. Roach, supra* 444 Pa. at 371, 282 A.2d at 384.

■ Our careful study of the entire record leads us to conclude that this contention of appellant is based upon pure speculation. Appellant has failed to introduce any evidence to support his claim that the exclusion of prospective jurors opposed to the death penalty prejudiced him. Rather, the record establishes that the trial court permitted appellant to engage in extensive individual voir dire, afford-

ing him an ample opportunity to secure a competent and fair jury.

■ Appellant also asserts that several errors were committed in the charge provided by the trial judge to the jury. We have reviewed each of the contentions of appellant and conclude there is no merit to any of the assertions of error. It is well settled in Pennsylvania that appellate review of the charge of the court for prejudicial and reversible error requires that the charge be read and considered in its entirety since error will not be predicated upon isolated excerpts of the charge. *Commonwealth v. Tolassi*, 489 Pa. 41, 413 A.2d 1003 (1980); *Commonwealth v. Woodward*, 483 Pa. 1, 394 A.2d 508 (1978); *Commonwealth v. Todaro*, 301 Pa.Super. 1, 446 A.2d 1305 (1982). Our study of the charge of the court leaves us with the conclusion that the charge as a whole was adequate and proper and did not contain any reversible error.

We have completed a thorough review of the entire record as well as of the briefs of the parties and conclude that the distinguished court en banc, specifically the learned Judges Maxwell E. Davidson, David E. Mellenberg and James N. Diefenderfer, has in an able and thorough opinion, very perceptively addressed and quite correctly ruled upon the remaining contentions of appellant.[3]

Judgment of sentence affirmed.

3. The remaining assertions presented by the Statement of Questions in the brief of appellant are:

[1] Whether or not the trial court improperly denied defendant's motion for a change of venue where there was massive pre-trial publicity on the day the trial was set to begin indicating that the court was of the opinion that the defendant was guilty of homicide, which publicity was precipitated by the court erroneously allowing newspaper coverage on the hearing of the petition to transfer to juvenile court, and by disseminating its opinion thereon to the news media?

[2] Whether or not the defendant was denied equal protection and due process of law under the fourteenth amendment where the defendant was the suspect who broke the case for the prosecution, by confessing and implicating the more culpable accomplice, yet the Commonwealth agreed to certify that the guilt of the accomplice

rose no higher than third degree murder while insisting upon the death penalty for the less culpable defendant.

[3] Whether or not the Commonwealth's evidence in its case in chief, and the corroborating evidence offered by the defendant supports a verdict of guilty to homicide no higher than murder in the third degree?