508 A.2d 568

COMMONWEALTH of Pennsylvania

v.

William S. BRADFIELD, Appellant.

Superior Court of Pennsylvania.

Argued Dec. 16, 1985.

Filed May 2, 1986.

468

Joshua D. Lock and Lawrence A. Kalikow, Harrisburg, for appellant.

Richard L. Guida, Harrisburg, for Com., appellee.

Before WIEAND, OLSZEWSKI and WATKINS, JJ.

WIEAND, Judge:

William S. Bradfield was found guilty by a jury of intentionally and deliberately murdering Susan Reinert and her two children, Karen and Michael. Post-verdict motions were dismissed, and Bradfield was sentenced to serve three consecutive life sentences. This appeal followed.

Susan Reinert's battered body was discovered in the trunk of her car in Dauphin County on June 25, 1979. The bodies of her two children have never been found. Mother and children were last seen alive entering Ms. Reinert's car in Delaware County on June 22, 1979. Bradfield argues on appeal that he should not have been tried in Dauphin County because there was no evidence that a murder had been committed in that county.[1] We disagree.

"For a county to take jurisdiction over a criminal case, some overt act involved in that crime must have occurred within that county." *Commonwealth v. Tumolo,* 455 Pa. 424, 427, 317 A.2d 295, 297 (1974). See: *Commonwealth ex rel. Chatary v. Nailon,* 416 Pa. 280, 206 A.2d 43 (1965); *Commonwealth v. Winter,* 324 Pa.Super. 258, 471 A.2d 827 (1984); *Commonwealth v. Katsafanas,* 318 Pa.Super. 143, 464 A.2d 1270 (1983); *Commonwealth v. Guess,* 266 Pa.Super. 359, 404 A.2d 1330 (1979); *Commonwealth v. Frey,* 258 Pa.Super. 288, 392 A.2d 798 (1978); *Commonwealth v. Creamer,* 236 Pa.Super. 168, 345 A.2d 212 (1975); *Commonwealth v. Simeone,* 222 Pa.Super. 376, 294 A.2d 921 (1972); *Commonwealth v. Marino,* 213 Pa.Super. 88, 245 A.2d 868 (1968), *aff'd,* 435 Pa. 245, 255 A.2d 911, *cert. denied sub. nom., Rispo v. Pennsylvania,* 395 U.S. 983, 89 S.Ct. 2145, 23 L.Ed.2d 771 (1969); *Commonwealth v. Tarsnane,* 170 Pa.Super. 265, 85 A.2d 606 (1952). While the Commonwealth bears the burden of proving facts sufficient

---

1. The parties have used the terms "venue" and "jurisdiction" interchangeably throughout their discussions of this issue. See: *Commonwealth v. Simeone,* 222 Pa.Super. 376, 379, 294 A.2d 921, 922 (1972) ("Although the cases present some confusion between the language of jurisdiction and that of venue, there is no doubt that the actuality of what our courts have done is to treat the place of the crime as determining which court has the power to try the offense.").

to establish jurisdiction, it may rely upon circumstantial evidence to meet its burden. *Commonwealth ex rel. Chatary v. Nailon, supra.*

■ The Crimes Code, at 18 Pa.C.S. § 102(c), provides that either the death of a homicide victim or the bodily impact causing death is an event sufficient to confer jurisdiction upon the territory in which such event occurred. Moreover, "if the body of a homicide victim is found within this Commonwealth, it is presumed that [the death] occurred within this Commonwealth." *Id.* This rule was prompted by unique problems which arise in ascertaining the situs of a homicide for jurisdictional purposes. Although, by its terms, the statute refers to the Commonwealth of Pennsylvania for purposes of applying territorially the law of homicide, the same considerations are applicable to determine in which county a homicide case is to be tried. Thus, in *Commonwealth v. Mull,* 316 Pa. 424, 175 A. 418 (1934), a case arising prior to enactment of the Crimes Code, the Supreme Court held that the finding of the decedent's body, with blood beneath it, would be sufficient to support a jury's finding that a homicide had occurred in Allegheny County. See also: *Commonwealth v. Leary,* 67 Lanc.L.Rev. 57 (1979). The presumption in this case that an overt act had occurred in Dauphin County was not rebutted or weakened merely because Susan Reinert was last seen alive in Delaware County. We conclude, therefore, that appellant could properly be tried in Dauphin County for the murder of Susan Reinert.

■ The Commonwealth's evidence showed the existence of a conspiracy between appellant and an unidentified second person to kill Susan Reinert in order to collect the proceeds of a policy of insurance on her life. The evidence tended to show that the deaths of the children were also brought about as a result of the same conspiracy. Because the death of Susan Reinert, presumed to have occurred in

Dauphin County,[2] was an overt act committed pursuant to that conspiracy, that act was sufficient to vest jurisdiction in the courts of Dauphin County to try appellant for the murders of the children committed pursuant to the same conspiracy.[3]

■ Moreover, the instant proceedings were properly tried in Dauphin County pursuant to the venue provisions of 42 Pa.C.S. § 4551(d). This section provides: "In any case where a multicounty investigating grand jury returns a presentment the supervising judge shall select the county for conducting the trial from among those counties having jurisdiction." This section of the Judicial Code empowers the supervising judge to designate one county in which several alleged offenses may be consolidated in a single trial. If offenses are otherwise properly consolidated, it is not necessary that the county so chosen be the situs of each and every crime charged. It is enough that one of the offenses being tried occurred in that county.

It is well established that the General Assembly may determine the jurisdiction of the courts of this Commonwealth. See: Pa. Const. art. V, § 10 (Supreme Court's power to prescribe rules governing the operations of all

**2.** Even if it had been established that the murder of Susan Reinert had been committed elsewhere, the result would be the same. The discovery of her body was necessary to enable appellant to collect the insurance on her life. The placing of her body in Dauphin County, therefore, was an act which was an integral part of the conspiracy and was sufficient to vest jurisdiction in the courts of Dauphin County to try all homicides committed pursuant to the same conspiracy.

**3.** Although appellant was convicted of conspiracy, the trial court granted appellant's post-trial motion in arrest of judgment on the grounds that the statute of limitations for those charges had expired. Trial Ct. Op. at 30. At the time trial commenced, the case law provided that the statute of limitations for conspiracy was the same as that of the most serious substantive crime upon which the conspiracy had been founded. See: *Commonwealth v. Askin*, 306 Pa.Super. 529, 452 A.2d 851 (1982). Because the substantive crime in the instant case was murder, the trial court determined pre-trial that the statute of limitations on the conspiracy charges had not expired. It was not until after trial that the Supreme Court reversed *Commonwealth v. Askin, supra,* and held that the statute of limitations for conspiracy is always two years. See: *Commonwealth v. Askin*, 502 Pa. 575, 467 A.2d 820 (1983).

courts shall not affect the right of the General Assembly to determine the jurisdiction of any court); *Commonwealth ex rel. Chatary v. Nailon, supra* (court has no jurisdiction over an offense unless it occurred within the county of trial *or unless by some statute it need not*).

■ The purpose of the legislature in authorizing the Supreme Court to convene multicounty, investigating grand juries was to enhance the ability of the Commonwealth to inquire into criminal activity or public corruption reaching into several counties. See: 42 Pa.C.S. §§ 4542, 4544. In light of this purpose, it is not reasonable to believe that the legislature intended separate trials in each county where acts of a criminal nature had been committed. Rather, it appears that the legislature intended that the supervising judge would select a single county in which all offenses set forth in a presentment could be tried. Susan Reinert's body having been found in Dauphin County, the supervising judge could direct that appellant be tried there for all murders arising from the same criminal scheme to kill Ms. Reinert in order to collect the insurance which had been written on her life.

■ Appellant argues that the multicounty, investigating grand jury lacked authority to issue a presentment against him because his alleged crimes did not fall within the statutory definition of organized crime or public corruption which the legislature had authorized the grand jury to investigate. There is no merit in this argument.

Organized crime is defined in part as "any continuing criminal conspiracy or other unlawful practice which has as its objective: (1) large economic gain through fraudulent or coercive practices...." 42 Pa.C.S. § 4542. The evidence presented at trial established that appellant's activities had constituted a "criminal conspiracy or other unlawful practice," and that these activities had had as their objective "large economic gain through fraudulent or coercive practices." It was also necessary that these activities be "continuing." We conclude, however, that appellant's conspir-

acy was continuing. It did not end with the deaths of the insured mother and her children. The murders were but one step in the ongoing conspiratorial scheme to recover life insurance proceeds.

■ If, during an investigation of ongoing criminal activity, a grand jury comes upon criminal activity which has been completed, it is not required to close its eyes thereto. A contrary interpretation of the statute would be unreasonable. See: *Commonwealth v. Iacino*, 490 Pa. 119, 415 A.2d 61 (1980) (grand jury did not exceed its authority in issuing presentment against defendant regarding improper sale of state property where grand jury had been impaneled to investigate corruption of supervisory personnel of Penn-DOT, evidence of improper sale arose in the course of that investigation, and sale had been made possible by the submission of false report by defendant, a maintenance supervisor).

■ During the proceedings before the grand jury in this case, Paul Tressler, a county prosecutor appointed to assist the Office of the Attorney General in presenting this matter to the grand jury, said in response to an expressed fear that members of the grand jury were not hearing all of the facts:

> I want to make that very plain to you. There is nobody in this courtroom that wants to convict this person more than Rick Guida and myself, and in the end we are gonna be the ones who stand up and ask a jury of twelve people to believe us. The only thing we are going to be able to give the jury is what is admissible evidence.
>
> So, sometimes if you think we are abrupt with you, I apologize. I get very emotional about this case, not from my own standpoint, those kids would have been 14 and 15 years old now. They would have been going to Disney World. They would have been playing softball and in the band. They have been denied the right.
>
> If we get an indictment out of this grand jury, by God, it is going to be one that is going to stick. If you people

don't understand that, I apologize, but that's the way it is going to be because I want to convict somebody. (N.T. Pre-Trial Conference, at 4–5.)

Appellant contends that Tressler's remarks concerning the Reinert children were inflammatory and prejudicial and, therefore, required that the presentments returned against appellant be quashed.

The decision to grant or deny a motion to quash is within the sound discretion of the trial judge and will be reversed on appeal only where there has been a clear abuse of discretion.... A court, moreover, "should not sustain a motion to quash ... except in a clear case where it is convinced that harm has been done to the defendant by improper conduct that interfered with his substantial rights."

*Commonwealth v. Niemetz,* 282 Pa.Super. 431, 439, 422 A.2d 1369, 1373 (1980), quoting *Commonwealth v. O'Brien,* 181 Pa.Super. 382, 397, 124 A.2d 666, 674 (1956), *overruled in Commonwealth v. Brabham,* 225 Pa.Super. 331, 309 A.2d 824 (1973). See: *Commonwealth v. Gemelli,* 326 Pa.Super. 388, 474 A.2d 294 (1984); *Commonwealth v. Brownmiller,* 141 Pa.Super. 107, 14 A.2d 907 (1940).

The comments of counsel in the instant case were not so egregious, in view of the totality of the evidence presented to the grand jury, that the court was required to invalidate the presentment. There was ample credible evidence to support the presentment. See and compare: *Commonwealth v. Evans,* 190 Pa.Super. 179, 154 A.2d 57 (1959) (inflammatory remarks made by Governor regarding the matter under investigation by the grand jury did not invalidate the subsequent indictments based on other, proper evidence), *aff'd,* 399 Pa. 387, 160 A.2d 407, *cert. denied,* 364 U.S. 899, 81 S.Ct. 233, 5 L.Ed.2d 194 (1960); *United States v. Riccobene,* 451 F.2d 586 (3d Cir.1971) (prosecutor's remarks to grand jury that key government informant would not testify before them because the proposed defendants were connected with organized crime and could harm him, while improper, did not require invalidation of indictment

where there was an abundance of competent evidence before the grand jury that supported the indictment). Therefore, the court did not err in denying appellant's motion to quash.

Appellant also contends that the trial court should have dismissed the presentment on the basis of the law stated in 18 Pa.C.S. § 110. He argues that prosecutions for murder and conspiracy were barred by a 1981 conviction in Delaware County for theft by deception from Susan Reinert. The theft, murder and conspiracy charges, he contends, arose from the same criminal episode.

Section 110 of the Crimes Code provides, in part:

Although a prosecution is for a violation of a different provision of the statutes than a former prosecution or is based on different facts, it is barred by such former prosecution under the following circumstances:

(1) The former prosecution resulted in an acquittal or in a conviction as defined in section 109 of this title ... and the subsequent prosecution is for:

. . . . .

(ii) any offense ... arising from the same criminal episode, if such offense was known to the appropriate prosecuting officer at the time of the commencement of the first trial and was within the jurisdiction of a single court....

18 Pa.C.S. § 110. In *Commonwealth v. Hude*, 500 Pa. 482, 491, 458 A.2d 177, 181 (1983), the Supreme Court stated that "in defining what acts constitute a single criminal episode, not only is the temporal sequence of events important, but also the logical relationship between the acts must be considered." The court quoted approvingly the following language taken from a law review article.

[I]n ascertaining whether a number of statutory offenses are "logically related" to one another, the court should initially inquire as to whether there is a substantial duplication of factual, and/or legal issues presented by the offenses. If there is duplication, then the offenses are

logically related and must be prosecuted at one trial. The mere fact that the additional statutory offenses involve additional issues of law or fact is not sufficient to create a separate criminal episode since the logical relationship test does not require "an absolute identity of factual backgrounds."

\* \* \* \* \* \*

The temporal relationship between criminal acts will be a factor which frequently determines whether the acts are "logically related." However, the definition of a "single criminal episode" should not be limited to acts which are immediately connected in time.

*Id.*, 500 Pa. at 491, 458 A.2d at 181–182, quoting Comment, *Commonwealth v. Campana and Section 110 of the Crimes Code: Fraternal Twins*, 35 U. of Pitts.L.Rev. 275, 286–287 (1973). In *Commonwealth v. Edwards*, 264 Pa.Super. 223, 399 A.2d 747 (1979), this Court stated that the same criminal episode requirement is satisfied where " 'an offense is a necessary step in the accomplishment of a given criminal objective ... [or where] the commission of an additional offense ... result[s] from the attempt to secure the benefit of a previous offense or to conceal its commission. ...' " *Id.*, 264 Pa.Superior Ct. at 228, 399 A.2d at 750, quoting Model Penal Code § 1.08 Comment at 37 (Tent. Draft # 5, 1956).

Appellant's 1981 conviction for theft by deception arose from an incident which had occurred between January and April of 1979. In that incident appellant had allegedly received $25,000 from Susan Reinert for the purpose of investing it on her behalf. The money had never been invested but, instead, had been retained by appellant for his own use. The killings on which appellant's present convictions rested had occurred in June of 1979 and had been committed by appellant and a co-conspirator for the purpose of obtaining the proceeds of a $730,000 life insurance policy purchased on Reinert's life, as well as the assets forming a part of her estate. The homicide offenses were neither temporally nor logically related to the prior crime of theft.

Not only did the thefts occur several months before the homicides, but the thefts were logically dissimilar and separate from the homicides. The only commonality pertained to the course of conduct by which appellant gradually was able to gain the trust of his victim. Beyond the common background facts, however, the theft and the killings involved separate and dissimilar acts and were not episodically connected.

It cannot be said that the theft and homicides were necessary steps in the accomplishment of a given criminal objective. See: *Commonwealth v. Edwards, supra.* While appellant is correct that both offenses were allegedly committed to obtain large sums of money, the means adopted by appellant to acquire the separate sums were temporally unrelated and factually dissimilar. Indeed, when appellant was able to persuade Reinert to entrust him with $25,000, Reinert had not yet executed the will naming appellant as beneficiary of her estate and had not purchased all of the life insurance policies which were the motives for her subsequent murder. Because the theft and homicide offenses were neither temporally nor logically related, they did not arise out of a single criminal episode. The trial court did not err in refusing to dismiss the informations on this basis.

█ Moreover, even if the offenses had arisen from the same episode, section 110 would not have required that the present prosecution be dismissed. At the time that appellant was charged with the theft offense, the Commonwealth lacked sufficient evidence to convict appellant of the homicide offenses. It was not until after appellant had been convicted of theft that the Commonwealth became aware of evidence directly linking appellant to the murders of Reinert and her children. Thus, the Commonwealth could not have charged appellant with the homicide offenses at the same time that he was charged with theft. Even though the cumulative effect of the circumstantial evidence known to the Commonwealth at the time appellant was charged with the theft offense might have been sufficient to sustain

a guilty verdict for the homicide offenses, the Commonwealth was not required to charge appellant with offenses when it was unsure of the ability of its evidence to sustain a conviction. See: *Commonwealth v. Kysor*, 334 Pa.Super. 89, 94, 482 A.2d 1095, 1098 (1984). Neither was it required to delay charging appellant with the theft offense when such a delay would have permitted the statute of limitations on the theft offense to expire.

■■ Appellant contends next that the trial court erred when it denied a pre-trial request for change of venue because of extensive publicity. He argues that pre-trial publicity pertaining to the deaths of Susan Reinert and her children was so pervasive and prejudicial that a fair trial could not be had in Dauphin County.

"Our cases make it clear that an application for a change of venue is addressed to the sound discretion of the trial court, and its exercise of discretion will not be disturbed by an appellate court in the absence of an abuse of discretion." *Commonwealth v. Casper*, 481 Pa. 143, 150, 392 A.2d 287, 291 (1978) (citing numerous cases). Generally, a defendant must demonstrate that the pre-trial publicity resulted in actual prejudice in the empaneling of the jury before a claim such as this will be successful. In some instances, however, "there can be pre-trial publicity so sustained, so pervasive, so inflammatory, and so inculpatory as to demand a change of venue without putting on the defendant any burden of establishing a nexus between the publicity and actual jury prejudice." *Commonwealth v. Frazier*, 471 Pa. 121, 127, 369 A.2d 1224, 1227 (1977), citing *Commonwealth v. Pierce*, 451 Pa. 190, 303 A.2d 209, *cert. denied*, 414 U.S. 878, 94 S.Ct. 164, 38 L.Ed.2d 124 (1973).

[T]he proper examination to be made by the trial court faced with a request for a change of venue charging that pretrial publicity will deny the accused's right to be tried by an impartial jury, is to first look at the *nature of the content* of the publicity. Does it contain references to the accused's prior record of criminal convictions, if any? Does it expose potential jurors to any confessions or

admissions of guilt allegedly made by the accused? Does it point to the accused's guilt in terms that go beyond objective news reporting and enter the realm of the emotional and of the inflammatory? If the court answers any of these questions in the affirmative, its analysis must proceed to a determination of the likelihood that a significant number of the prospective jurors in the county were, in fact, exposed to such publicity. If the trial court answers "yes" to any of the above three questions concerning the content of the pretrial publicity, and if the record shows that there is a likelihood that a significant portion of the population was exposed to publicity of that nature, refusal to grant a change of venue would be an abuse of discretion unless the record also indicates that a sufficiently long period of time has passed between the time of the publicity and the time of the application for a change of venue for the court to conclude that any prejudice which may have been initially created by the publicity has been dissipated.

*Commonwealth v. Frazier, supra,* 471 Pa. at 131–132, 369 A.2d at 1229–1230 (emphasis in original).

Most of the publicity about the death of Susan Reinert occurred in 1979, when her body was found, and in 1981 when Bradfield was convicted of theft. This publicity had been largely dissipated by the time of the homicide trial because of the intervening time. In April, 1983, and continuing until the start of trial in October, 1983, however, there were renewed media references to appellant's 1981 theft conviction and an additional reference to an admission of guilt allegedly made by appellant. The theft conviction and an alleged statement by appellant to Proctor Nowell that he 'had been present when Reinert and the children were killed but that he had not killed them himself were discussed by the media. This information was also received in evidence at trial. There were further references by the media, made pre-trial, to an entry in appellant's diary that he had wished to kill Susan Reinert for insurance money, and also to a statement allegedly made to Arnold Winder,

an inmate at the State Correctional Institute at Camp Hill, that appellant had been involved in the murders and that he wanted to kill three witnesses who had testified against him. These latter facts were not admitted into evidence. We examine these references and their effect to determine whether a significant number of prospective jurors were exposed to the prejudicial publicity.

The articles received into evidence came primarily from major newspapers in the Harrisburg area, i.e., The Patriot and The Evening News.[4] The statistics received in evidence showed that at all relevant times the circulation of the Patriot had been 25% of the total voting population of Dauphin County; the circulation of The Evening News had been 34%; and the Sunday Patriot's circulation had been 62%. Between April 6, 1983, the date of appellant's arrest, and October 11, 1983, the date on which the homicide trial commenced, 189 calendar days elapsed. During this time, 44 articles pertaining to the case appeared in the printed media. Not all of the articles published during this period contained references to prejudicial material, however, and many did not appear on the first page.

" 'In reviewing the trial court's decision, the only legitimate inquiry is whether any juror formed a fixed opinion of [the defendant's] guilt or innocence as a result of the pre-trial publicity.' " *Commonwealth v. Casper, supra,* quoting *Commonwealth v. Kichline,* 468 Pa. 265, 274, 361 A.2d 282, 287 (1976).

"It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold

---

**4.** There were also articles from The Philadelphia Inquirer, The Philadelphia Daily News and the Sunday Philadelphia Inquirer. The evidence showed, however, that the circulation of these newspapers in Dauphin County was negligible.

that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."

*Commonwealth v. Casper, supra,* 481 Pa. at 152, 392 A.2d at 292, quoting *Irvin v. Dowd,* 366 U.S. 717, 722–723, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751, 756 (1961).

In the instant case 92 jurors were individually examined. While most of the prospective jurors had read something about the case, only 8 had formed a fixed opinion of appellant's guilt. All of the jurors ultimately selected stated that they had no fixed opinions regarding appellant's guilt or innocence and that they could put aside anything they had read or heard and could decide the case solely on the basis of the evidence presented at trial. Therefore, there is no evidence that appellant suffered any actual juror prejudice as a result of pre-trial publicity.

■ We conclude also that the pre-trial publicity was not so pervasive that the entire community was inflamed in such a way as to make it impossible for appellant to receive a fair trial. As previously stated, only 8 of the 92 jurors examined had formed a fixed opinion of appellant's guilt. In *Commonwealth v. Romeri,* 504 Pa. 124, 470 A.2d 498 (1983), *cert. denied,* 466 U.S. 942, 104 S.Ct. 1922, 80 L.Ed.2d 469 (1984), the Supreme Court concluded that certain prejudicial material which had been published pre-trial was not "pervasive" because 7 of the 88 prospective jurors questioned had indicated that they had formed a fixed opinion as to the defendant's guilt. The Court said:

[I]t is impossible to conclude that the publicity was pervasive or that the community had been saturated with prejudicial communication where fewer than 8% of the jurors questioned indicated that they had a fixed opinion as to the guilt of [the defendant]. *Compare: Commonwealth v. Cohen,* 489 Pa. 167, 413 A.2d 1066 (1980)

(change of venue required where 53% of prospective jurors questioned were excused because of prejudgment, i.e., a "fixed and irrevocable opinion on guilt"); *Commonwealth v. Casper, supra* (no change of venue required where 2 out of 42 prospective jurors knew of case and could not decide on the basis of evidence at trial); *Commonwealth v. Stoltzfus*, 462 Pa. 43, 337 A.2d 873 (1975) (no change of venue required where 31 out of 139 prospective jurors questioned had formed fixed opinions); *Commonwealth v. Hoss*, 445 Pa. 98, 283 A.2d 58 (1971) (no change of venue required where 26 of 138 jurors questioned had formed opinion).

*Id.* 504 Pa. at 134–135, 470 A.2d at 503, citing *Commonwealth v. Cohen, supra*, 489 Pa. at 186–187, 413 A.2d at 1077. In the instant case, less than 9% of the prospective jurors questioned had formed fixed opinions as to appellant's guilt. There is, therefore, no indication from the record that pre-trial publicity was so pervasive that the community was predisposed to appellant's guilt.

▆▆▆▆ The Commonwealth's theory at trial was not that appellant had physically killed Susan Reinert and her children but that appellant was criminally liable for their deaths as an accomplice or co-conspirator. The existence of a conspiracy, therefore, was a necessary element in the Commonwealth's proof. Under these circumstances, the trial court did not abuse its discretion in allowing the charges of conspiracy and homicide to be tried at the same time.[5]

▆▆▆▆ The trial court allowed testimony by witnesses who had been told by Susan Reinert that she intended to marry

5. In its Bill of Particulars, the Commonwealth stated that it did not know exactly what acts appellant had committed in aiding and abetting another person in planning and committing the murders. Appellant argues that if the conspiracy charges had not been part of the prosecution, this statement would have prevented the admission of evidence tending to establish an accomplice theory of liability. We disagree. While the law provides that the Commonwealth is limited to proving the theory advanced in its Bill of Particulars, the information provided by the Commonwealth in this case was not inconsistent with an accomplice or co-conspirator theory of liability for murder.

appellant and move to England, that she intended to give appellant her deceased mother's engagement ring so that he could have it reset, and that she intended to give appellant $25,000 for the purpose of investing in a high yield savings certificate. The trial court ruled that these statements were admissible to show Reinert's state of mind even though they were in the nature of hearsay. Appellant, apparently conceding that these statements were within the parameters of the state of mind exception to the hearsay rule—at least he does not argue otherwise—contends that the receipt of these statements violated his constitutional right to confront his accuser.[6]

> Although a fundamental right, [the] right of confrontation is not absolute. In certain circumstances, the admission of hearsay evidence does not violate the constitutional guarantee; in others, its introduction is constitutionally repugnant. . . . In delineating the line between admissible and inadmissible hearsay in a criminal case, it is . . . necessary to assess the purpose of the proffered evidence and the risks inherent in its admission.

*Commonwealth v. McCloud*, 457 Pa. 310, 312, 322 A.2d 653, 655 (1974). In *Commonwealth v. Thomas*, 443 Pa. 234, 279 A.2d 20 (1971), the trial court admitted statements made by a homicide victim which tended to show the existence of a relationship between the defendant and the victim. On appeal, the Supreme Court held that the admission of these statements, to show state of mind, had not violated the defendant's confrontation rights. Moreover, the Court observed, the declarant had been the victim, who was unavailable, and the existence of the relationship was shown by other evidence, the admissibility of which was not questioned. *Id.*, 443 Pa. at 243–244, 279 A.2d at 25.

In the instant case, the evidence of which appellant complains was neither a crucial nor substantial portion of the Commonwealth's case. The evidence showed merely that Reinert and appellant had been romantically involved and that she had entrusted him with things of value. We

6. See: U.S. Const. amend VI; Pa. Const. art. 1, § 9.

conclude that this evidence was not prejudicial. The jury could consider and evaluate the evidence only as showing Susan Reinert's trust of appellant. That such a relationship existed was established circumstantially by other evidence. The admission of this evidence does not require a new trial.

■ In *Commonwealth v. Maxwell*, 505 Pa. 152, 477 A.2d 1309 (1984), the Supreme Court considered the right of the Commonwealth to ask prospective jurors about their opinions regarding the death penalty. The Court said: "Simply questioning potential veniremen on their position regarding the death penalty, or excluding those who are strongly opposed to it and cannot impose it under any conditions, does not necessarily produce a prosecution oriented jury." *Id.*, 505 Pa. at 165, 477 A.2d at 1316, citing *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968); *Commonwealth v. Brown*, 462 Pa. 578, 342 A.2d 84 (1975); *Commonwealth v. Kenney*, 449 Pa. 562, 297 A.2d 794 (1972); *Commonwealth v. Speller*, 445 Pa. 32, 282 A.2d 26 (1971). Therefore, we reject appellant's argument that he was denied a fair trial because of the questions asked by the Commonwealth during voir dire or by the peremptory challenges exercised by the Commonwealth. Appellant has failed to show that the exclusion of prospective jurors opposed to the death penalty caused prejudice. The trial court did not err by refusing to grant a new trial on this basis. See: *Commonwealth v. Romeri*, 314 Pa.Super. 279, 460 A.2d 1139 (1983), *aff'd*, 504 Pa. 124, 470 A.2d 498, *cert. denied*, 466 U.S. 942, 104 S.Ct. 1922, 80 L.Ed.2d 469 (1984).

■ Similarly, appellant's contention that the trial court should have required the Attorney General to state on the record the reason for each peremptory challenge is without merit. "Peremptory challenges, historically and by definition, are arbitrary and perhaps even irrational challenges to the seating of a juror. They are totally subjective and not subject to scrutiny or examination." *Commonwealth v. Henderson*, 497 Pa. 23, 29, 438 A.2d 951, 954 (1981).

■ Appellant's contention that a new trial is necessary because of alleged bystander misconduct is unsupported by the record. Appellant avers that during the course of the trial, while the jury was being transported to or from the courthouse, a citizen bystander shouted "Hang him". The record, however, does not contain any reference to this incident. Thus, not only are we unable to ascertain whether this incident did in fact occur, but we are also unable to determine whether any of the jurors heard the remark. Appellant's argument in this regard, therefore, must fail. See: *Commonwealth v. Doyle*, 275 Pa.Super. 373, 390, 418 A.2d 1336, 1345 (1979) (court must decide cases on basis of facts in record and cannot accept, as fact, statement appearing only in a party's brief).

■ Moreover and in any event, even if appellant had shown that the incident in fact occurred and that one of the jurors had in fact heard and understood it, we are of the view that a new trial would not be warranted. The trial of this case spanned seventeen days and the record is replete with instructions to the jury regarding the fact that its verdict was to be based exclusively on evidence presented during the trial. There is nothing to suggest that the jury's verdict was influenced in any way by the alleged remark. See: *Commonwealth v. Craig*, 471 Pa. 310, 370 A.2d 317 (1977).

Appellant argues that the trial court erred by: (1) refusing to grant his request for a continuance; (2) denying him the right to conduct voir dire; (3) refusing to admit into evidence the testimony of Richard Toner pertaining to a statement made to Toner by Jay Smith which allegedly exculpated appellant; (4) denying appellant's request that the trial court make a pre-trial determination of the existence of any aggravating circumstances justifying the imposition of the death penalty before allowing the prosecution to death qualify the jury; and (5) refusing to permit appellant to present evidence regarding Susan Reinert's alleged sexual promiscuity. These arguments have been considered

carefully by the trial court, and there is nothing to be added to the learned discussion appearing in the court's opinion.

■■ Finally, appellant contends that his trial counsel was ineffective because he failed to object to the trial court's charge which allegedly eliminated intent as an element of accomplice liability and for failing to preserve this issue in post-verdict motions. Because appellant is presently being represented by the same counsel who represented him at trial, and because counsel's ineffectiveness is not apparent from the record, we are directed by prior decisions to remand for the appointment of new counsel to represent appellant. See: *Commonwealth v. Fox,* 476 Pa. 475, 383 A.2d 199 (1978); *Commonwealth v. Serianni,* 337 Pa.Super. 309, 486 A.2d 1349 (1984).

The judgment of sentence is vacated, at least for the time being, and the proceedings are remanded for the appointment of new counsel to represent appellant in the presentation of his claim that trial counsel was constitutionally ineffective. If it is determined by the trial court that counsel provided appellant with assistance that was constitutionally effective, the sentence may be reimposed. If counsel rendered ineffective assistance, however, a new trial must be granted. Jurisdiction is not retained meanwhile.

OLSZEWSKI, J., files a concurring statement.

OLSZEWSKI, Judge, concurring:

We have no difficulty in joining the majority since it is clear that *Serianni* and *Fox* are controlling, thereby requiring a remand for appointment of new counsel. In doing so, the Court does not pass judgment or come to a conclusion regarding the effectiveness of counsel's actions in this case; that is a matter to be considered at a later time.

We are concerned not about those attorneys who make honest mistakes, but about those instances in which attorneys deliberately err. It is with considerable interest, therefore, that we take notice that the Philadelphia County

490

Court of Common Pleas has adopted a rule to deal with those instances in which attorneys admit their trial incompetence in filing their appeals. We also have observed that the Pennsylvania Supreme Court Chief Justice has indicated that the Supreme Court Criminal Rules Committee should give serious consideration to the creation of a state-wide rule dealing with the issue of counsel admitting incompetency in order to secure a new trial.