**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Gregory PENNINGTON, Appellant.**

Superior Court of Pennsylvania.

Submitted Jan. 24, 2000.

Filed April 19, 2000.

Rose Marie D'Adamo, Philadelphia, for appellant.

Catherine L. Marshall, Asst. Dist. Atty., Philadelphia, for Com., appellee.

Before JOHNSON, J., CERCONE, President Judge Emeritus, and OLSZEWSKI, J.

OLSZEWSKI, J.:

¶ 1 Gregory Pennington appeals *nunc pro tunc* from judgment of sentence arising from the robbery and murder of a University of Pennsylvania graduate student. We affirm.

¶ 2 The trial court succinctly set forth the relevant facts and procedural history:

On August 29, 1994, at approximately 10:00 p.m., in the 1200 block of Peach Street, Philadelphia, Pennsylvania, the defendants, Gregory Pennington and Anthony Archer,[1] along with co-defendants Antoine Saunders, Ollie Taylor and Khalis Edmondson, hatched a plot to commit a robbery. At that time, no specific victim was chosen as the object of the robbery. Their plan was to search the streets of West Philadelphia, in the extended are [sic] of the University of Pennsylvania, to find a target of their scheme. The plan was most likely conceived when Anthony Archer, Ollie Taylor and Khalis Edmondson met earlier that evening at their friend, Tyrik's house, where Mr. Archer procured a sawed off .22 caliber rifle from Tyrik and gave it to Mr. Saunders. Gregory Pennington joined the group at 55th & Chester Avenue as they walked from Tyrik's house to Peach Street. In the 1200 block of Peach Street, they encountered a fifth member of the band, Antoine Saunders. While at Peach Street, all five defendants agreed to commit a robbery and they left to roam the streets to look for a victim. The defendants encountered their first potential

1. A different panel of this Court heard Mr. Archer's appeal. Our *en banc* decision is reported at 722 A.2d 203 (Pa.Super.1998) (*en banc*).

victim, a young lady[,] at 49th & Springfield Avenue. They did not rob her because the lighting conditions were too good. At 48th & Osage, the defendant's encountered Mr. Al–Moez Alimohamed, the ultimate victim, at or near the 4700 block of Pine Street where he was using a public phone. When the victim was finished with the phone, the defendants approached him in front of a Rite Aid Pharmacy, pushed him against a wall, went through his pockets, taking his keys and identification, punched him, kicked him and knocked him to the ground. This was all while Mr. Saunders threatened Mr. Alimohamed at gun point [sic]. The police also observed this incident from a vehicle stopped near the intersection of Pine Street and Hanson Street. The defendants retreated across the street and Mr. Pennington and Mr. Edmondson fled. Mr. Saunders and Mr. Taylor returned to the victim and Mr. Saunders attempted to shoot him but was unable to disengage the safety of his rifle. Mr. Taylor grabbed the gun from Mr. Saunders and shot Mr. Alimohamed one time in the right chest while he lay helpless on the ground after the robbery. The bullet passed through his right lung and through his heart. Mr. Saunders and Mr. Taylor pleaded guilty to first degree murder and testified at the trial of Mr. Archer and Mr. Pennington.

Trial Court Opinion, 6/1/99, at 2–4 (citations omitted).

¶ 3 Before trial, appellant made a motion to transfer to decertify the case to the juvenile court pursuant to the Juvenile Act. The Honorable Carolyn Temin originally granted appellant's motion, but, after learning more information about appellant's role in the incident, vacated her previous order and denied decertification. *See* Judge Temin Opinion, 3/5/96, at 11–12. After a trial, a jury acquitted appellant of murder and convicted him of robbery, conspiracy to commit robbery, and theft. *See* Trial Court Opinion, 6/1/99, at 1. The trial

judge, the Honorable James J. Fitzgerald, III, then denied appellant's motion to transfer the case to Family Court for sentencing without a hearing. *See id.* at 6. The court then sentenced him to ten to thirty years imprisonment. *See id.* at 2. On September 19, 1997, we dismissed appellant's initial appeal for failure to file a brief. *See* Supplemental Trial Court Opinion, 7/14/99, at 1. On March 8, 1999, the trial court granted appellant leave to file this appeal *nunc pro tunc. See id.*

¶ 4 Appellant first argues that the lower court erred in applying the weapons enhancement provision of the sentencing guidelines to appellant's sentence. Appellant claims that he did not have actual possession of the gun used to kill the victim, nor, he claims, was the gun within his immediate physical control when the crime was committed. Consequently, appellant argues that the court imposed an excessive sentence. We disagree.

¶ 5 Because he claims that his sentence is excessive, he does not challenge its legality; rather, he challenges its discretionary aspects. Pennsylvania law mandates that an appellant cannot appeal as of right from the discretionary aspects of a sentence. *See* 42 Pa.C.S.A § 9781(b). Rather, appellant must meet two requirements before we will review his challenge on the merits. *See Commonwealth v. Coss,* 695 A.2d 831, 833 (Pa.Super.1997). First, appellant must "set forth in his brief a concise statement of reasons relied upon for allowance of appeal with respect to the discretionary aspects of a sentence." Pa. R.A.P. 2119(f); *see also Commonwealth v. Hatcher,* 746 A.2d 1142, 1144 (Pa.Super. 2000). Because his brief includes such a statement, appellant has met the first requirement. Second, appellant must show "that there is a substantial question that the sentence imposed is not appropriate under this chapter." 42 Pa.C.S.A. § 9781(b); *Commonwealth v. Koehler,* 558 Pa. 334, 737 A.2d 225, 244 (1999). An appellant raises a substantial question with a "colorable argument that the sen-

tencing judge's actions were either: (1) inconsistent with a specific provision of the Sentencing Code; or (2) contrary to the fundamental norms which underlie the sentencing process." *Commonwealth v. Brown*, 741 A.2d 726, 735 (Pa.Super.1999). On several occasions, we have found that the application of the weapon enhancement presents a substantial question. *See, e.g., Hatcher*, 746 A.2d 1142, 1144; *Commonwealth v. Greene*, 702 A.2d 547, 551 (Pa.Super.1997); *Commonwealth v. Morgan*, 425 Pa.Super. 344, 625 A.2d 80, 83 (1993); *Commonwealth v. Bowen*, 417 Pa.Super. 340, 612 A.2d 512, 516 (1992). Therefore, we will address the merits of appellant's claim.

◼ ¶ 6 The trial court enhanced appellant's sentence because "a firearm was used during the commission of the robbery." Supplemental Trial Court Opinion, 7/14/99, at 5. In 1994, when appellant committed the crime, the sentencing guidelines provided that the deadly weapon enhancement shall be applied "[w]hen the court determines that the offender possessed a deadly weapon, as defined in [the Crimes Code] during the commission of the current conviction offense." 204 Pa.Code § 303.9 (1994). Further, "the term 'possessed' means on the defendant's person *or within his immediate physical control*." 42 Pa.C.S.A. § 2154(b) (emphasis added). We agree with appellant that the court erroneously concluded that all that was required for the enhancement to apply was that a weapon was used in the commission of the crime, but find, as a matter of law, that appellant "possessed" the gun during its commission.

¶ 7 In *Bowen*, the defendant and his accomplices displayed weapons to their victims before robbing them. *See Bowen*, 612 A.2d at 513. After robbing and beating one victim, the robbers entered a car, where another victim was located, and beat him until he gave them his coat. *See id.* The second victim testified that he did not see a gun in appellant's hand, but testified that he saw at least two weapons during the incident. We upheld the trial court's imposition of the weapons enhancement, finding it irrelevant that the defendant did not have a gun on his person in the car. *See id.* at 516. We found first that the robbery was commenced when all of the perpetrators brandished their weapons, and second, and most importantly for the present matter, that

> when [the victim] was surrounded by [the defendant] and two accomplices inside the car, two of the accomplices had weapons in their hands. One of the gunmen was in the front seat inches away from [defendant].... Even if we were to assume that [defendant] did not possess a gun at the point [the victim] was cornered, assaulted[,] and robbed inside the car, we would conclude that a gun was within [defendant's] immediate physical control.... [I]t is hard to imagine weapons more within his immediate physical control than were the weapons of his companions at that moment. [Defendant] had ready access to the physical possession of a gun, under the circumstances described here.

*Id.*

◼ ¶ 8 The present matter is analogous to *Bowen*. There, as here, appellant and his co-conspirators all had knowledge of the existence of a weapon and had ready access to it during the robbery. Likewise, in *Hatcher*, we applied the weapons enhancement to an assault and reckless endangerment conviction where "[a]ppellant was shoulder-to-shoulder with the other two assailants, who handed the gun back and forth." *Hatcher*, 746 A.2d 1142, 1145. We determined that "[a]ppellant easily could have walked out and taken possession of the gun at any time." *Id.* ("The trial court correctly stated that enhancement was proper because the handgun used by King and Harris was in close physical proximity to Appellant, thus triggering the 'within immediate physical control' provision of the statute."). Similarly here, appellant could easily have been giv-

en or taken the gun at any moment while the group assaulted the victim.

¶ 9 While appellant claims that *Greene* supports his contention that the court erred in applying the weapons enhancement, this reliance is misplaced. There, the defendant waited in a car while his co-conspirator attempted to rob a jewelry store. *See Greene*, 702 A.2d at 555. On appeal, we found that the fact that the defendant knew that the robber had a firearm was insufficient to warrant imposition of the weapons enhancement. *See id.* at 552–53. We held that "the deadly weapon enhancement [was] inapplicable . . . because the gun was neither on appellant's person nor within his immediate physical control at any time during the perpetration of the robbery." *Id.* at 553. By contrast, in the present matter, there was evidence that appellant was in the immediate vicinity of his co-conspirators when the gun was used to threaten the victim. We hold, therefore, that there were sufficient grounds for the trial court to apply the weapons enhancement, and thus it is not necessary to remand for re-sentencing despite its erroneous rationale.

¶ 10 Appellant also argues that the court applied an incorrect offense gravity score (OGS) for robbery in calculating his sentence. The court assigned an OGS of 11 (inflicts serious bodily injury) rather than an OGS of 9 (threatens another with or intentionally puts him in fear of immediate serious bodily injury). We recently addressed this exact issue in our *en banc* review of Anthony Archer's appeal.[2] *See Archer*, 722 A.2d at 211–12. Archer argued, as appellant does, that, because he was acquitted of murdering the victim, the court could not consider the gunshot when calculating his OGS for robbery. He claimed that the initial attack and robbery was insufficient to meet the criteria for "serious bodily injury." *Id.* at 208. We stated that "[e]ven though Appellant was

acquitted of murder, the injuries resulting from the shooting are attributable to Appellant regardless of who fired the gun." *Id.* at 212. We concluded, "[w]e find that the court was correct in finding a gravity score of 11, for regardless of the injuries sustained from the assault, the death resulting from the gunshot should have been considered as well." *Id.* Appellant's argument fails for the same reason.

¶ 11 Appellant next argues that the court failed to take into account his particular circumstances when sentencing appellant, relying instead on the seriousness of the crime. "Generally, the imposition of sentence is a matter vested within the sound discretion of the trial court. To constitute an abuse of discretion, the sentence must either exceed statutory limits or be manifestly excessive." *Commonwealth v. duPont*, 730 A.2d 970, 986 (Pa.Super.1999) (citation omitted). Here, appellant claims his sentence is manifestly excessive, as he must because the court sentenced him within the guidelines. We disagree with appellant's contention that the court failed to consider all relevant factors. Judge Fitzgerald indicated that he considered the record and pre-sentence report before him when imposing his sentence. *See* Trial Court Opinion, 6/1/99, at 13. It is well-settled that "[w]here pre-sentence reports exist, [Pennsylvania courts] shall continue to presume that the sentencing judge was aware of relevant information regarding the defendant's character and weighed those considerations along with mitigating statutory factors." *Commonwealth v. Devers*, 519 Pa. 88, 546 A.2d 12, 18 (1988). "Therefore, this requirement is met if the court states on the record that it has consulted a pre-sentence report." *Commonwealth v. Brown*, 741 A.2d 726, 735 (Pa.Super.1999). The court specifically indicated that it did not consider the death of the victim in sentencing appellant. *See* Supplemental

---

**2.** Technically, because the panel found that appellant had not properly preserved his argument on appeal, our discussion of the merits of Archer's claim is dicta. We find the panel's reasoning persuasive, however, and adopt the analysis in this case.

Trial Court Opinion, 7/14/99, at 5. In sum, the record simply does not support appellant's contention that the court abused its discretion in imposing sentence.

¶ 12 Appellant also argues that the denial of his two motions to decertify and transfer the case to juvenile court was error. First, he argues that Judge Temin erred when she denied appellant's motion for decertification (transferal) pursuant to 42 Pa.C.S.A. § 6322(a). He also claims that Judge Fitzgerald erred when he refused to decertify the case after appellant was acquitted of murder.

¶ 13 In 1994, the Juvenile Act provided,[3] that exclusive jurisdiction vested in the juvenile court when a juvenile had committed a crime. *See* 42 Pa.C.S.A. § 6322(a). There was an exception, however, when a minor was charged with murder. *See id.* In such cases, "jurisdiction remains in the criminal division and any transfer from the criminal division to the juvenile division is within the sound discretion of the trial court." *Archer*, 722 A.2d at 206 (citing 42 Pa.C.S.A. § 6322(a)).

¶ 14 The Act provided that "the child shall be required to show the court that the child is amenable to treatment, supervision or rehabilitation as a juvenile" in order to have his case decertified to the juvenile court. 42 Pa.C.S.A. § 6322(a); *see also Commonwealth v. Aziz*, 724 A.2d 371, 373 (Pa.Super.1999). Thus, appellant bears the burden of demonstrating that all the following factors weigh in favor of decertification:

> the age, mental capacity and maturity of the minor; the degree of criminal sophistication of the child; previous records, if any; the nature and extent of the juvenile history; whether the child can be rehabilitated prior to the expiration of the Juvenile Court jurisdiction; probation or institutional report; the nature and circumstances of the acts for

which the transfer is sought; and any other relevant factors.

*Archer*, 722 A.2d at 206; *see also* 42 Pa. C.S.A. § 6355(a)(4)(iii)(A) (listing factors and allowing transfer "if *all* of the [factors] exist") (emphasis added).

¶ 15 We will reverse a decision not to decertify a case only upon " 'a misapplication of the law or an exercise of manifestly unreasonable judgment based on partiality, prejudice or ill will.' " *Commonwealth v. Johnson*, 542 Pa. 568, 669 A.2d 315, 321 (1995) (quoting *Commonwealth v. Romeri*, 314 Pa.Super. 279, 460 A.2d 1139, 1145 (1983), *aff'd*, 504 Pa. 124, 470 A.2d 498 (1983)); *see also Commonwealth v. Laudenberger*, 715 A.2d 1156, 1159 (Pa.Super.1998) ("A trial court's decision to deny decertification will only be disturbed upon a showing of gross abuse of discretion."), *appeal denied,* —— Pa. ——, 751 A.2d 187 (2000).

¶ 16 Appellant contends that the court did not consider all the required factors in making its determination. He relies, as did his co-conspirator Archer, on our Supreme Court's decision in *Commonwealth v. Greiner*, 479 Pa. 364, 388 A.2d 698 (1978), in arguing that "the Court abused its discretion where one strong fact in favor of certification [is] insufficient to outweigh numerous counter veiling [sic] facts strongly weighing against certification." Appellant's brief, at 33. Such reliance is as equally misplaced as Archer's was. *See Archer*, 722 A.2d at 207. As we explained in *Archer*, *Greiner* involved a transfer *from* juvenile court *to* criminal court. *See id.* Therefore, the Commonwealth had the burden of demonstrating that such transfer was required. *See Greiner*, 388 A.2d at 702. Here, by contrast, appellant bears the burden of demonstrating that the court did not consider all the required factors.

¶ 17 Judge Temin's opinion denying appellant's motion for decertification outlines

---

**3.** Amendments to the Juvenile Act became effective after the date of the appellant's crimes. *See* Pub.L. No. 1127, § 8.

the various sources used by her in denying certification, including notes of testimony of various related proceedings, appellant's previous criminal record, statements made by appellant and others to the police, and letters and reports of various individuals. *See* Judge Temin Opinion, 3/5/96, at 3. The court determined that there was no evidence "implicat[ing] Pennington in either the initial beating or in the actual shooting of the victim" and there was expert testimony that "the defendant was amenable to treatment within the juvenile court system." *Id.* at 8–9. Therefore, the court "initially granted the petition for decertification on January 24, 1996[,] based on its conclusion that the greater weight of the evidence presented to this court militated in favor of transferring Pennington to juvenile court for disposition." *Id.* at 11. Subsequently, however, Judge Temin learned that, prior to the assault and murder of the victim, appellant and two co-conspirators had been "walking around asking people for bullets." *Id.* at 12. She then vacated her previous order because she found that these acts indicated that appellant "was actively engaged in the preparatory steps of the incident" and "was not merely a passive participant in the events." *Id.*

¶ 18 The record reflects, contrary to appellant's assertion, that the court considered all factors, and not only his activities before the robbery. The court found that the severity of the crime and appellant's role in it, as well as appellant's prior contacts with the justice system, outweighed the factors favoring decertification. Appellant has not provided any proof that the court's decision was based on any improper factors. *See Commonwealth v. Shaffer*, 722 A.2d 195, 198 (Pa.Super.1998), *appeal denied*, 559 Pa. 665, 739 A.2d 165 (1999). We cannot say that the judge's decision not to decertify appellant's case was an abuse of discretion.

¶ 19 Appellant also contends that Judge Fitzgerald erred in not transferring the case to juvenile court after appellant was acquitted of murder. At the time of appellant's crime, the Juvenile Act provided that if a child was acquitted of murder the case could be transferred to the juvenile court for sentencing. *See* 42 Pa.C.S.A. § 6322(b). In determining whether to transfer such a case, the court must apply the same factors as used in a pre-trial decertification determination. *See Archer*, 722 A.2d at 207 ("[*Commonwealth v. Solomon*, 451 Pa.Super. 239, 679 A.2d 775, 777 (1996)] dictates that the factors set forth in section 6355(a)(4)(iii)(A) should be considered in a section 6322(b) transfer which is comparable to the application of these factors in a § 6322(a) transfer."). Our standard of review is also the same as for a pretrial decertification order: "Again, we must determine whether the trial court abused its discretion when reviewing the denial of a hearing and the denial of the motion to transfer." *Id.*

¶ 20 Appellant disingenuously argues that Judge Fitzgerald incorrectly relied on Judge Temin's order denying decertification before trial. The record reflects otherwise. In *Archer*, we noted that Judge Fitzgerald conducted an *independent* examination of these factors. *See id.* at 208. Appellant baldly asserts the contrary. *See* Appellant's brief, at 17 ("Moreover, the Honorable Trial Court seemed to feel that Judge Temin's amenability finding was binding upon it."). In his opinion denying decertification in both appellant's and Mr. Archer's cases, Judge Fitzgerald noted

[t]his court made a determination independent from Judge Temin that the defendants were not amenable to treatment within the juvenile justice system. This Court had access to most of the material set forth in Judge Temin's Opinions including both defendants' juvenile records; the notes of testimony from the decertification hearing before Judge Temin (Mr. Pennington's juvenile record and the notes from his decertification were actually made part of the sentencing record in this matter).; all of the statements of both defendants and the codefendants given prior to trial and

during the trial and other relevant factors considered by Judge Temin. This court also had the benefit of the presentence and mental evaluations conducted on both defendants for the purposes of sentencing.

\* \* \*

Regarding Mr. Pennington, the court considered all of the factors as set forth by Judge Temin in the aforementioned Opinion. Of particular note was Mr. Pennington's discharge from the juvenile system on August 22, 1994, seven days before he committed the offense. The presentence report confirms that Mr. Pennington was using a significant amount of marijuana the night before the incident. This was after the defendant had the opportunity to work within the juvenile justice system and was recently discharged from its care. Despite the efforts of the juvenile justice system according to all of these reports, this defendant was using drugs and committed this offense after recent discharge. The mental health evaluation prepared for this case evidenced no mental illness and that Mr. Pennington was competent to receive a sentence. ... [T]his court concluded from all of these factors that ... Mr. Pennington who was almost 19 years of age at the date of sentencing ... could [not] be rehabilitated within the juvenile justice system prior to the expiration of the juvenile court jurisdiction when [he] reached age 21....

Trial Court Opinion, 6/1/99, at 10 (citation omitted). This opinion and the record both indicate that the court applied the required factors and did not abuse its discretion in denying decertification after appellant's trial.

¶ 21 Judgment of sentence affirmed.

¶ 22 JOHNSON, J., concurs in the result.