**Commonwealth v. Copeland**

*Jeffrey S. Dimmig, deputy district attorney*, for Commonwealth.

*Irene Chiavaroli-Johns,* for defendant.

DANTOS, *J.,* March 30, 2011—Defendant, Dante Copeland, has been charged with robbery,[1] kidnapping for ransom,[2] criminal conspiracy to commit theft by unlawful taking,[3] receiving stolen property,[4] two (2) counts of

---

1. 18 Pa. C.S.A. § 3701(a)(1)(ii).
2. 18 Pa. C.S.A. § 2901(a)(1).
3. 18 Pa. C.S.A. § 3921(a); 18 Pa. C.S.A. § 903(a)(1).
4. 18 Pa. C.S.A. § 3925(a).

unlawful restraint,[5] and conspiracy to commit robbery.[6] Presently before this court is defendant's motion to transfer case to juvenile court. 42 Pa. C.S.A. § 6322. A hearing relative to defendant's motion to transfer case to juvenile court was conducted before this court on February 24, 2011. At the evidentiary hearing, the defendant presented the testimony of Lehigh County juvenile probation officers Patrick Best and Aaron Lichtfus. Additionally, this court reviewed the transcript of the preliminary hearing conducted on November 17, 2010, before District Justice Anthony Rapp.

Initially we note that at a decertification hearing, the defendant bears the burden to establish by a preponderance of the evidence that the transfer will serve the public interest. 42 Pa. C.S.A. § 6322(a); see also *Commonwealth v. Sanders*, 814 A.2d 1248, 1250 (Pa. Super. 2003). To resolve the question of whether the defendant has satisfied his burden of proof, consideration must be given to the factors enumerated in the juvenile act, 42 Pa.C.S.A. § 6355(a)(4)(iii). The factors contained in aection 6355(a)(4)(iii) are the following:

(A) the impact of the offense on the victim or victims;

(B) the impact of the offense on the community;

(C) the threat to the safety of the public or any individual posed by the child;

(D) the nature and circumstances of the offense allegedly committed by the child;

---

5. 18 Pa. C.S.A. § 2902(a)(2); 18 Pa. C.S.A. § 2902(a)(1).
6. 18 Pa. C.S.A. § 3701(a)(1)(ii); 18 Pa. C.S.A. § 903(a)(1).

(E) the degree of the child's culpability;

(F) the adequacy and duration of dispositional alternatives available under this chapter and in the adult criminal justice system; and

(G) whether the child is amenable to treatment, supervision or rehabilitation as a juvenile by considering the following factors:

(I) age;

(II) mental capacity;

(III) maturity;

(IV) the degree of criminal sophistication exhibited by the child;

(V) previous records, if any;

(VI) the nature and extent of any prior delinquent history, including the success or failure of any previous attempts by the juvenile court to rehabilitate the child;

(VII) whether the child can be rehabilitated prior to the expiration of the juvenile court jurisdiction;

(VIII) probation or institutional reports, if any;

(IX) any other relevant factors. 42 Pa. C.S.A. § 6355(a)(4)(iii).

While the Juvenile Act requires that a decertification court consider all of the amenability factors, it is silent as to the weight assessed to each by the court. *Commonwealth v. Jackson*, 555 Pa. 37, 44, 722 A.2d 1030, 1033 (Pa. 1999); *Sanders*, 814 A.2d at 1251. The ultimate decision whether

to decertify a matter to juvenile court lies within the sole discretion of the decertification court. *Jackson* at 45, 722 A.2d at 1034. See also *Commonwealth v. Coto*, 562 Pa. 32, 40, 753 A.2d 217, 222 (2000).[7]

The incident which brought about this prosecution is alleged to have occurred on November 10, 2010. On that date, John Sanchez received a telephone call from an acquaintance, co-defendant Ruben Valdez,[8] inquiring if Mr. Sanchez would do him a favor and drive him to his house to pick up his clothes.[9] (N.T. 11/17/2010, pp. 4-6, 19) Mr. Sanchez agreed to do this favor for him. (N.T. 11/17/2010, p. 6) Mr. Sanchez drove his vehicle to 332 W. Brookdale Street, Allentown, Lehigh County, Pennsylvania and picked up co-defendant Valdez and defendant Dante Copeland.[10] (N.T. 11/17/2010, pp. 6, 21) At that time, co-defendant Valdez entered Mr. Sanchez's vehicle as the front passenger, and defendant Dante Copeland sat in the rear driver's side seat behind Mr. Sanchez. (N.T. 11/17/2010, pp. 6, 22)

As directed, Mr. Sanchez drove to 715 N. 9th Street, Allentown, Lehigh County, where co-defendant Valdez entered the house and returned a few minutes later with clothing. (N.T. 11/17/2010, p.6) Then Mr. Sanchez was requested to drive to a friend's residence located at the

---

7. While a decertification court must consider all of the factors set forth in 42 Pa.C.S.A. § 6355, it need not address, in seriatim, the applicability and importance of each factor and fact in reaching its final determination. *Jackson* at 45, 722 A.2d at 1034.

8. Mr. Sanchez had met co-defendant Valdez in September of 2009, at the house on Brookdale Street. (N.T. 11/17/2010, pp. 16-17).

9. Co-defendant Valdez offered the victim thirty ($30.00) dollars for gas money. (N.T. 11/17/2010, 24).

10. Mr. Sanchez knew defendant Dante Copeland from middle school. (N.T. 11/17/2010, pp. 21, 47).

Mack Pool apartments. (N.T. 11/17/2010, pp. 7, 24) When they arrived at this desired location, Mr. Sanchez parked and turned off his vehicle. (N.T. 11/17/2010, p. 7) Suddenly, Defendant Dante Copeland put a shoestring, rope or something similar around Mr. Sanchez's neck and started to choke him. (N.T. 11/17/2010, pp. 7-8, 22, 24-25, 46-47) At the same time, co-defendant Valdez brandished a knife, placed it to Mr. Sanchez's throat, and threatened to kill Mr. Sanchez if he did not give them three thousand ($3,000.00) dollars. (N.T. 11/17/2010, pp. 8-9, 25-27) Mr. Sanchez's hands were bound with electrical tape. (N.T. 11/17/2010, pp. 9, 31-32) The co-defendants then ordered Mr. Sanchez to place telephone calls to obtain the desired money, by reading a script that had been written on a note.[11] (N.T. 11/17/2010, pp. 8-9, 27)

The first telephone call that was placed was to Mr. Sanchez's mother. (N.T. 11/17/2010, p. 9) However, Mr. Sanchez's mother did not believe what her son was saying pursuant to the scripted conversation and hung up. (N.T. 11/17/2010, pp. 9, 29, 49-50, 52-53) Next, co-defendant Valdez called Mr. Sanchez's father. (N.T. 11/17/2010, p. 10) This time co-defendant Valdez spoke directly with the father and demanded one thousand ($1,000.00) dollars. (N.T. 11/17/2010, p. 10) Mr. Sanchez's father was advised that if he did not provide them with one thousand ($1,000.00) dollars within two (2) hours, they were going to kill his son. (N.T. 11/17/2010, pp. 10, 29) Mr. Sanchez's father left work immediately to travel to Brooklyn, New York, to acquire the one thousand ($1,000.00) dollars ransom. (N.T. 11/17/2010, pp. 10, 30)

---

11. The note said, "Mom, these people got me hostage. They want $3,000 in 12 hours, and if not, they're going to kill me." (N.T. 11/17/2010, p. 28)

After this telephone call was concluded, Mr. Sanchez was ordered into the passenger seat of the car, and co-defendant Valdez drove the vehicle back to the residence located on Brookdale Street.[12] (N.T. 11/17/2010, pp. 11, 31-32) At the residence, Mr. Sanchez, still bound, was placed in the bathroom by defendant Dante Copeland and co-defendant Valdez. (N.T. 11/17/2010, pp. 11, 33-34, 60, 63) Co-defendant Valdez gave co-defendant Lorenzo Dyer the knife and put him in charge of watching the victim. (N.T. 11/17/2010, pp. 12, 34, 60-61) The co-defendants took Mr. Sanchez's cellular phone and keys off his person. (N.T. 11/17/2010, pp. 12, 33)

Over the next several hours, the co-defendants placed telephone calls to the victim's family members in an effort to put pressure on them to obtain the money. (N.T. 11/17/2010, pp. 12, 37, 39) At one point, Mr. Sanchez's sister spoke with the co-defendants and requested more time to gather the money. (N.T. 11/17/2010, pp. 13, 39) Angered, defendant Dante Copeland grabbed a cigar cutter and told the victim's sister that "if you think I'm playing, let's chop off one of your fingers and send it over there." (N.T. 11/17/2010, p. 13) Defendant Dante Copeland actually took the cigar cutter and placed it on the victim's finger. (N.T. 11/17/2010, pp. 13, 47)

Thereafter, at approximately 8:00 p.m., defendant Dante Copeland left the residence.[13] (N.T. 11/17/2010, pp. 14, 65) Upon his return, he noticed police officers outside. (N.T. 11/17/2010, p. 14) Consequently, defendant

---

12. The residence located at 322 W. Brookdale Street, Allentown was owned by a person named Joey. (N.T. 11/17/2010, p. 32).

13. Co-defendant Valdez took Mr. Sanchez's car keys and gave them to defendant Dante Copeland so that he could drive two (2) unidentified girls home. (N.T. 11/17/2010, pp. 14, 35, 64)

Dante Copeland ran into the residence, related to the co-defendants that the police were on scene, put the victim in the closet and ordered him to "act cool," and turned out the lights. (N.T. 11/17/2010, pp. 14, 36, 42-43, 56-57) Defendant Dante Copeland hid in a closet from the police. (N.T. 11/17/2010, p. 36) Approximately thirty-five to forty-five minutes later, at about 12:10 a.m., the police knocked on the door of the residence and they were subsequently let into the house by co-defendant Valdez. (N.T. 11/17/2010, pp. 15, 57-58) The victim did not immediately relate to the officers what had transpired. (N.T. 11/17/2010, pp. 42-44) Instead, he was taken to Lehigh County prison, along with the co-defendants, it appearing that he participated in the scheme to extract money from his parents. (N.T. 11/17/2010, pp. 42-43, 65) Approximately forty-five (45) minutes later, however, Mr. Sanchez revealed to detective Louis Collins of the Allentown Police Department what had occurred and he was released from prison. (N.T. 11/17/2010, p. 43-44, 67-68)

Defendant Dante Copeland was born on May 8, 1994. He was sixteen (16) years old at the time of this incident, and is presently just shy of seventeen (17) years old. Prior to being arrested in the within matter, the defendant was involved in the juvenile criminal system. Specifically, in June of 2007, the Lehigh County Juvenile Probation Department received a referral involving the defendant based on a charge of disorderly conduct that stemmed from an attempted fight on the property of the Raub Middle School. Specifically, an officer from the Allentown Police Department witnessed a crowd of students surrounding the defendant who had removed his shirt in preparation of fighting another student. When the officer instructed

the defendant to "back off," the defendant fled and a foot pursuit ensued. Ultimately the defendant was caught by the police officer. The defendant was placed on a consent informal adjustment for this offense.

A second referral was received by the Lehigh County Juvenile Probation Department with regard to this defendant based on a non-payment charge. At that time the defendant was given community work service to perform in lieu of the payments owed. The defendant completed the ordered community work service.

Next, on March 24, 2010, the defendant was detained by the Lehigh County Juvenile Probation Department arising from an incident in Catasauqua involving the defendant discharging a firearm. In particular, the defendant brandished a handgun while on a playground in Catasauqua. He fired the handgun into the air while a large number of children and families were present, thereby causing a great panic and commotion at the park.[14] The defendant fled after this incident. The police were notified and officers from the Catasauqua Police Department arrived on scene. Through their investigation, the officers learned the identity of the shooter. When they apprehended the defendant, he possessed eleven (11) bags of marijuana on his person. The defendant was adjudicated delinquent based on the charges of recklessly endangering another person and possession of marijuana. In reference to this referral, the defendant was placed in a sixty (60) day leadership development program through Cornell Abraxus. The defendant completed this program on June

---

14. It was later determined that the gun the defendant possessed was a BB gun.

21, 2010,[15] but remained on probation through the Lehigh County Juvenile Probation Department. The defendant had numerous probation violations, which included not abiding by his curfew, missing three (3) scheduled appointments with his probation officer and interacting with people with whom he was prohibited.

Another referral was received on August 17, 2010, by the Lehigh County Juvenile Probation Department in relation to this defendant. On this date, the defendant was the passenger in a vehicle which the driver did not have permission to use. The subject vehicle was stopped by officers and the defendant fled. A foot pursuit ensued. The defendant was eventually located, but refused to cooperate to be taken into custody. Consequently the K-9 unit was called to assist the officers in apprehending the defendant. With regard to this matter, the defendant was adjudicated delinquent on the charge of disorderly conduct and defiant trespass, a summary offense. The disposition included house arrest for a period of thirty (30) days and a period of probation. As part of his probation, the defendant was ordered to attend eight (8) weekends of boot camp. The defendant never began this program because he absconded prior to its commencement.

Throughout the course of the Lehigh County Juvenile Probation Department's involvement with the defendant, defendant's disrespectful attitude and unsatisfactory academic performance were discussed. At all relevant times, the defendant was uncooperative and disrespectful

---

15. Even though the defendant was successfully discharged from this program, the staff at Cornell Abraxus expressed numerous concerns with regards to the defendant: the defendant's anti-social thinking, his lack of cooperation in groups, and his anger management issues.

with his mother. Indeed, while his mother made reasonable requests of the defendant in an attempt to provide him with a structured environment, the defendant was insolent and uncontrollable. Also, while the defendant is intelligent (which was demonstrated by his outstanding academic performance at Cornell Abraxus), he was failing most of his tenth grade classes at Dieruff High School.[16] The defendant showed a lack of motivation, as was evidenced by his appalling grades, his eleven (11) absences and his twenty-five (25) tardies. The defendant's school work was described as incomplete and below his ability. Moreover, the defendant was suspended from Dieruff High School for out of control behavior. The defendant is mature for his age, street savvy and is a self-proclaimed member of the "Handsome Boys."

Without a doubt, the nature and circumstances of the within alleged offenses are extremely serious. Defendant was not simply in the wrong place at the wrong time, but rather was a willing and active participant in the crimes. The defendant was integral to the success of the criminal plan, as the defendant participated in the planning and carrying out of the robbery, kidnapping and unlawful restraint of the victim. The nature of the crimes themselves and the defendant's role in the crimes demonstrated criminal sophistication. This was not a spur of the moment crime without clearly defined roles and parts. The defendant's street intelligence was essential to achieving the desire goal — robbery and kidnapping for ransom. No factors weigh so heavily to this court as do the sophistication of the crimes committed and the defendant's degree of

---

16. When the defendant was in tenth grade in 2010, the highest grade that he achieved was a "D" in algebra, despite having an above average intelligence and no mental illness or defect.

culpability in the commission thereof. See *Commonwealth v. Pennington*, 751 A.2d 212, 219 (Pa. Super. 2000).

Furthermore, the within crimes are an escalation of the defendant's prior criminal conduct. In the past, the defendant exhibited assaultive and defiant behavior. However, the within alleged crimes demonstrate a layer of planning and sophistication that illustrates that the defendant has ascended to the next level of criminal behavior.

Additionally, the defendant's actions posed a grave risk to the victim and the community at large. It is undeniable that the victim and the victim's family have been negatively affected by these terrible crimes. Also, the community was impacted by these heinous crimes. This type of criminal activity causes others in the community to be concerned for their safety and to fear that similar occurrences will transpire. The community would be best served by maintaining the defendant's adult status.

Lehigh County Juvenile Probation officer Aaron Lichtfus opined that decertification to juvenile court is not appropriate in this situation and that the juvenile system is inadequate to supervise, treat or rehabilitate the defendant before the defendant turns twenty-one (21) years old. This court must agree. Defendant's prior juvenile history, his probation violations, the sophistication of the crimes charged, his street-savvy behavior, and his anti-social personality are indicative of the defendant's reduced amenability to treatment, supervision or rehabilitation prior to his attainment of age twenty-one (21). This court recognizes that juvenile court jurisdiction ends at the age of twenty-one (21) regardless of whether or not the defendant

continues to pose a threat to society. *Commonwealth v. Zoller*, 498 A.2d 336, 440 (Pa. Super. 1985). A period of four (4) years is woefully inadequate to expect that the defendant would respond to treatment. The evidence presented at the decertification hearing revealed that the defendant does not have the ability to benefit from what the juvenile system as to offer. Within the adult system, a state correctional institution is available to the defendant that would suit his needs. Specifically, Pine Grove is a state correctional facility housing young adult offenders between the ages of fifteen (15) and twenty-one (21) years old.

This court finds that the defendant has not borne the heavy burden placed upon him to prove that transfer to the juvenile system would serve the public interest. In particular, decertification is not appropriate because often serious nature of the charges, the escalation in criminal behavior and the criminal sophistication exhibited. See *Commonwealth v. Aziz*, 724 A.2d 371, 379 (Pa. Super. 1999) (seriousness of allegations, failure to respond to previous treatment, significant pattern of violent and escalating criminal behavior justified in denying decertification). In short, the defendant's amenability to treatment, supervision, or rehabilitation as a juvenile is suspect at best. *Commonwealth v. Austin*, 664 A.2d 597 (Pa. Super. 1995). Consequently, the defendant's motion to transfer case to juvenile court is denied.

## ORDER

And now, March 1, 2011, upon consideration of defendant's motion to transfer case to juvenile court, and after hearing held on February 24, 2011, and for the

reasons stated in the accompanying opinion, it is hereby ordered that the defendant's motion to transfer case to juvenile court is denied.