J-S81042-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| MARCIA KALISTA RICHARDS | |
| Appellant | No. 3612 EDA 2015 |

Appeal from the Judgment of Sentence October 12, 2015
In the Court of Common Pleas of Lehigh County
Criminal Division at No(s): CP-39-CR-0005424-2014

BEFORE:  BOWES, J., MOULTON, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:                    **FILED JANUARY 19, 2017**

Marcia Kalista Richards ("Appellant") appeals from the judgment of sentence entered by the Court of Common Pleas of Lehigh County after she pled guilty to one count each of Aggravated Assault and Burglary committed within the context of a domestic dispute.  Sentenced to an aggravated range sentence of not less than four nor more than ten years' incarceration, Appellant challenges the discretionary aspects of her sentence by claiming it was, *inter alia*, the product of an erroneous application of the Deadly Weapon Enhancement-Possessed ("DWE") Matrix.  For the following reasons, we vacate judgment of sentence and remand for resentencing.

---

[*] Former Justice specially assigned to the Superior Court.

The pertinent facts of this case, gleaned from Appellant's guilty plea and sentencing hearings, are as follows: 59 year-old Appellant pled guilty to one count of Aggravated Assault—Attempt to Cause Serious Bodily Injury and one count of Burglary for breaking into the residence of her estranged husband, John Richards, on June 7, 2014, at just before midnight and assaulting a houseguest, 33 year-old Jen Fink. According to Ms. Fink, she and her nine year-old son were at Richards' residence that evening only because he had helped her resolve car troubles earlier in the day and then suggested he could watch her son in the event she was called in for an evening shift at St. Luke's Hospital, where both she and Richards worked.[1] She explained that she later decided to stay overnight because she had drunk several beers at Richards' place and thought it imprudent to drive her rental car home under those circumstances. N.T. 5/18/15 at 8; 10/12/15 at 40-41.

_____

[1] John Richards attested that he was romantically involved with Fink both while Appellant and he still resided together and on the day in question. Fink, however, denied ever having a "real" relationship with Richards and insisted on the witness stand that they had not seen one another for about six months prior to her staying at Richard's home that evening.

In an effort to impeach Fink's credibility as a witness, defense counsel confronted Fink with a series of emails in which she referred to Richards by an affectionate pet name, said she would follow him down to Florida for a vacation—which she eventually did, and said "Yes, a ring from you would mean the world to me." N.T. 10/12/15 at 55, 58. Fink first suggested that she was referring to her grandfather's ring which Richards had in his possession, but she later abandoned that position. *Id*.

Earlier that same day, Appellant had visited Richards at his residence, which she owned, and she claimed she had asked him for a divorce. She said her husband of 27 years denied her request because he believed that divorce was "not right." N.T. at 68. Instead, Richards asked Appellant to go to bed with him, an offer which Appellant declined. *Id*. According to Appellant, Richards gave the impression that he would be alone all night. N.T. at 67.

Appellant went out to a concert in Jim Thorpe with friends that evening, and, afterwards, she testified, she decided to return to Richards' home to get her dog and to continue their discussion about getting an amicable divorce. N.T. at 68-69. When Appellant arrived, however, she saw Fink through the living room window and reacted violently, breaking a window on the door to gain access inside. N.T. at 44; Affidavit of Probable Cause, 6/7/15. Fink had already called 911 because she did not know who was entering the home. N.T. at 45.

According to Fink, Appellant attacked with punches and hair pulling, but she was able to get Appellant into a corner and sat on top of her in an effort to gain control. N.T. at 45-46. At that point, Appellant got Fink's hand in her mouth and bit down hard on a pinky finger. N.T. at 46. Fink managed to break free and, with her son still sleeping in a nearby room, ran out the kitchen door in the hope that Appellant would follow her outside, she testified. N.T. at 46. Appellant, however, locked the door behind Fink. N.T. at 47.

Fink redialed 911 and the dispatcher connected her to the State Police barracks in Bethlehem. N.T. at 47. At some point during the call, she approached the kitchen door with the intention of entering the house again, but Appellant opened it from the inside, as Appellant ushered Fink's son outside to his mother and closed the door a second time. N.T. at 47, 60. Fink testified that her son was unharmed but "covered in blood" from coming in contact with Appellant's superficial cuts sustained from the broken window. N.T. at 47-48. Fink and her son walked away from the house and waited for police in a nearby patch of woods. N.T. at 47.

Appellant then turned her attention to her husband, who was sleeping in his upstairs bedroom. According to the police report, Richards awoke to Appellant's screaming and stabbing his mattress with a kitchen knife. N.T. at 21. She then dropped the knife and started striking Richards with closed fists until Richards pushed her away and she relented. Investigators subsequently saw multiple cuts in the mattress and their search of Richards' bedroom uncovered a bent knife lying at the foot of the bed.

Richards refused to cooperate with the investigation against Appellant, however, as he blamed himself for her violent outburst, citing his long history of infidelity and mistreatment of Appellant as pushing her beyond her breaking point. N.T. at 26. It was mainly Richards' unwillingness to admit that Appellant posed any risk of harm to him that the Commonwealth dropped the aggravated assault charge related to her conduct in his bedroom. N.T. at 26. Richards reiterated this position at Appellant's

- 4 -

sentencing hearing, where he testified that Appellant never threatened him with a knife and that he never even saw a knife until a police officer brought it outside and showed it to him. N.T. at 23-26.

For her part, Appellant admitted she stabbed Richards' bed, but only after he was out of harm's way:

> **THE COURT**:     I have some [questions for Appellant after she read a statement to the court]. So when you pled guilty to these offenses, factually, do you admit that you grabbed , as you said, grabbed the knife, went upstairs and stabbed the bed?
>
> **APPELLANT:**     I do.  I did do that.
>
> **Q:**     All right.  And at that time, Mr. Richards was in the bed?
>
> **A:**     No.  He removed himself from the bed, or he was moving out of the bed.  I stabbed the bed because it demonstrated – to me it represented infidelity.
>
> I had no intention of ever hurting my husband.  Based on the lifestyle that we've had, I never had to hurt my husband.  My husband periodically and very commonly attempted suicide and I stopped him.  I loved my husband and I always will but I know I cannot be with him.

N.T. at 37.

Ms. Fink sustained a lacerated and broken pinky resulting in a permanent loss of sensation to the finger.  N.T. 8/18/15 at 10.  Fink also testified that she and her son "didn't sleep for months" after the episode and that, for nearly one year her son would get "a little worried and scared" if he heard noises at night.  N.T. 10/12/15 at 49.

Character witnesses included an oncologist, fellow dieticians and college professors, and neighbors testifying to Appellant's lifetime of caring,

kindness, honesty, and integrity in both her personal and professional life. They spoke of how Appellant, a nationally published, master's degree-level dietician considered a premier renal specialist in her field, tended to dialysis and cancer patients' needs expertly and compassionately during her long career. She was described as an engaging public speaker and educator who uniquely inspired colleagues and college students, alike, with empathetic stories about her patients and the medical complexities they face. Witnesses spoke emotionally about her ability to make lasting personal connections with patients and their families during very difficult times. They also discussed the remorse, embarrassment, and sadness Appellant displayed after committing the crimes in question.

The court noted that Appellant had no previous criminal record. It was also in possession of a defense-obtained psychological evaluation and violence risk assessment performed by a board-certified clinical psychologist, Dr. Frank M. Dattilo, Ph.D., who opined to a reasonable degree of psychological certainty that Appellant's behavior in the instant offense was

> highly atypical of her and should be considered an aberration. This aberrant behavior came on the heels of years of marital deterioration and stress which was very unfortunate. Ms. Kalista-Richards is truly remorseful for her behavior and had taken responsibility even beginning with cooperating with her arrest by Pennsylvania state troopers on the scene. She has also continued to seek treatment and rehabilitation and is, in my opinion a low risk for future psychological certainty[.]
>
> Psychological Evaluation and Violence Risk Assessment, 2/17/15, at

18.

The court announced that it was applying the DWE-Possessed Matrix to Appellant's sentence and, as noted supra, imposed an aggravated range sentence on the count of Aggravated Assault and a standard range sentence on the count of Burglary, both sentences to run concurrently. When defense counsel questioned the propriety of an aggravated range sentence the following discussion took place:

> **THE COURT:** It is an aggravated sentence. The charge was reduced to the Felony 2 as a –
>
> **PROSECUTOR:** It's a Felony 1.
>
> **THE COURT:** All right. Okay. Then the Court finds the defendant is a danger to the community. I don't believe the guidelines adequately reflect the facts of this case. There was a child present during the assault and there was – how do we classify Mr. Richards' testimony? There was – there were additional victims that charges were not pursued on. Okay. That will take care of the record. Now do you understand your sentence?

N.T. 10/12/15 at 65-66. After the denial of Appellant's motion to modify sentence, this timely appeal followed.

Appellant presents the following questions for our review:

1. Did the lower court err when it found [Appellant] possessed a Deadly Weapon for the purpose of sentencing enhancement?

2. Did the lower court err when it imposed a sentence in the aggravated range of the sentencing guidelines?

3. Did the lower court err when it failed to state sufficient reasons for a sentence in the aggravated range of the sentencing guidelines?

Appellant's brief at 6.

Initially, we recognize that "[i]t is firmly established that a plea of guilty generally amounts to a waiver of all defects and defenses except those concerning the jurisdiction of the court, the legality of sentence, and the validity of the guilty plea." ***Commonwealth v. Dalberto***, 648 A.2d 16, 18 (Pa.Super. 1994) (citations omitted). "A defendant," however, "who has pled guilty may challenge the discretionary aspects of his sentence as long as the defendant did not agree to a negotiated sentence as part of a plea agreement." ***Commonwealth v. Johnson***, 758 A.2d 1214, 1216 (Pa.Super. 2000) (citation omitted). Instantly, Appellant, who entered an open plea of guilty, may challenge the discretionary aspects of her sentence. ***See id***.

This Court has stated that

> [c]hallenges to the discretionary aspects of sentencing do not entitle an appellant to appellate review as of right. Prior to reaching the merits of a discretionary sentencing issue:
>
> > We conduct a four part analysis to determine: (1) whether appellant has filed a timely notice of appeal, *see* Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, *see* Pa.R.Crim.P. [720]; (3) whether appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, 42 Pa.C.S.A. § 9781(b).
>
> Objections to the discretionary aspects of a sentence are generally waived if they are not raised at the sentencing hearing

or raised in a motion to modify the sentence imposed at that hearing.

**Commonwealth v. Evans**, 901 A.2d 528, 533–34 (Pa.Super. 2006) (some citations and punctuation omitted).

Concluding that Appellant has complied with the first three requirements to discretionary review, we consider whether she raises a substantial question in her Pa.R.A.P. 2119 concise statement for allowance of appeal. In her statement, she contends that the lower court erroneously applied the deadly weapons-possessed sentencing enhancement to her Aggravated Assault conviction. This claim not only addresses the discretionary aspects of sentencing, **see Commonwealth v. Kneller**, 999 A.2d 608, 613 (Pa.Super. 2010) (*en banc*) ("a challenge to the application of the deadly weapon enhancement implicates the discretionary aspects of sentencing."), it also raises a substantial question meriting review:

> A substantial question is raised when the appellant advances a "colorable argument" that the sentence was either "inconsistent with a specific provision of the Sentencing Code" or "contrary to the fundamental norms which underlie the sentencing process." [**Commonwealth v. Pennington**, 751 A.2d 212, 215-16 (Pa.Super. 2000) ] (citing 42 Pa.C.S.A. § 9781(b))

> Our case law has established that application of the deadly weapons enhancement presents a substantial question. **See id.** at 216 (concluding that the appellant raised a substantial question by challenging the trial court's application of the deadly weapons enhancement, based on the appellant's assertion that he had not had actual possession of the deadly weapon, a gun); **Commonwealth v. Hatcher**, 746 A.2d 1142, 1144 (Pa.Super.2000) (same); **Commonwealth v. Magnum**, 439 Pa.Super.616, 654 A.2d 1146, 1149–50 (1995) (concluding that the Commonwealth raised a substantial question by challenging the trial court's failure to consider a deadly weapons

enhancement in a situation where the appellant used a knife to threaten the victims); [**Commonwealth v.**] **Scullin,** 414 Pa.Super. 442, [607 A.2d 750, 752–53 (1992) ] (concluding that the Commonwealth raised a substantial question by challenging the trial court's determination that a tire iron thrown by the appellee was not a deadly weapon).

**Commonwealth v. Shull**, --- A.3d --- 2016 WL 4769512, at **6-7 (Pa.Super. September 13, 2016) (quoting **Commonwealth v. Raybuck**, 915 A.2d 125, 127–28 (Pa.Super. 2006)). **See also Commonwealth v. Diamond**, 945 A.2d 252, 259 (Pa.Super. 2008) (recognizing "this Court has repeatedly instructed that the sentencing court must correctly apply the sentencing guidelines to reach the correct point of departure, before exercising its discretion to depart from the guidelines in any particular case. These rules apply to the deadly weapons enhancement."). We, therefore, shall address the first discretionary aspects claim raised herein.

When reviewing a challenge to the discretionary aspects of sentencing, we observe the following standard:

Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

**Commonwealth v. Antidormi**, 84 A.3d 736, 760 (Pa.Super. 2014), **appeal denied**, 626 Pa. 681, 95 A.3d 275 (2014).

During sentencing, the court referred to Appellant's acquisition of a knife during the course of events and indicated it would apply the deadly

weapon possessed enhancement for purposes of sentencing. N.T. at 62-63. The court did not specify whether the enhancement applied to one or both offenses, but it couched its deadly weapon enhancement discussion and decision within a larger statement addressing all of Appellant's actions and expressing concern over what could have happened had Fink remained in the home after Appellant grabbed the knife:

> And shaking heads or not [referring to supporters of Appellant in attendance], there was a nine-year old child there. So either you thought it out once you got there, had certain intentions when you went up to the bedroom, where I am convinced your husband was laying [sic] in bed and started screaming as he originally told the police, and started stabbing the bed and then beating him.
>
> So for purposes of sentencing I am going to find not deadly weapon used but we will do deadly weapon possessed, but those actions are almost like an animal.
>
> I mean, you don't want to see yourself that way but that's who you were that night, covered in your own blood, crawling through a window, trying to hurt someone. Then going up and, I mean, had you not been stopped, I don't know what might have happened. Had she [Fink] not run out of the house and been able to get out, what would her fate have been? You don't know that. I don't know that.
>
> I know that it was an aggravated assault. I know that you caused her serious bodily injury and for that there is a consequence. [Brief discussion ensues, clarifying that plea was for attempted serious bodily injury]. So while I agree it's not your normal behavior, given your life and your life's work, all of which you should be commended for, frightening set of facts.
>
> Clearly there is another side of you that is, indeed, violent and did cause harm to another person. And for that, regardless of your request, you are going to jail.

- 11 -

N.T. at 62-64.

The court then imposed a period of incarceration of not less than forty-eight months on the count of Aggravated Assault, a term which falls within the aggravated range for both the Basic and the DWE/Possessed matrices. The court thereafter segued seamlessly to the Burglary conviction and began to sentence Appellant to a term of "not less than three years," which, again, would have represented an aggravated range sentence under both matrices, but it immediately changed course and withdrew that sentence in favor of what it called a "standard" range sentence of 33 months to 10 years.[2]  N.T. at 64-65.  Important for our purposes, this revised sentence was a standard range sentence under the DWE/Possessed matrix alone, and it suggests that the court had also been calculating the Aggravated Assault sentence in accordance with the enhanced matrix.[3]

The plain language of Section 303.10 provides that an enhancement "shall apply to each conviction offense for which a deadly weapon is possessed or used."  204 Pa.Code § 303.10(a)(4).  At no time during either

---

[2]  Specifically, the court stated "Count 2, burglary, is the costs of prosecution, imprisonment for not less than, let's see – not less than three years – well, we will make that one standard – 33 months to 10 years, concurrent to Count 1."  N.T. at 65.  Notably, the 33-month DWE-Possessed term is at the top end of the enhanced standard range and would reside within the aggravated range of a basic matrix sentence.

[3] In its Pa.R.A.P. 1925(a) opinion, the court opines that it properly applied the DWE-Possessed matrix within a discussion as to the propriety of both sentences.  Pa.R.A.P. 1925(a) Opinion, filed 10/27/2015, at 2-3.

the guilty plea or sentencing hearing did the Commonwealth allege that Appellant possessed the knife during her assault of Ms. Fink; nor did testimony adduced at the hearing support the position that Appellant possessed a knife at the time of the assault. Yet it appears from the notes of testimony that the lower court applied the enhancement to its computation of Appellant's Aggravated Assault conviction. Accordingly, we are constrained to vacate judgment of sentence and remand for resentencing, where the court shall clarify that it is applying the basic sentencing matrix to achieve a proper starting point for imposing sentence on the Aggravated Assault conviction.[4]

Judgment of sentence vacated. Case remanded for resentencing. Jurisdiction relinquished.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/19/2017

_____

[4] Given our vacation of Appellant's sentence, we need not address her second and third questions presented.

- 13 -